[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I.
This action seeking a dissolution of marriage was brought by the 38 year old plaintiff husband against the 36 year old CT Page 6626 defendant wife by complaint dated September 13, 1990. The parties were married on August 3, 1974 at Wolcott, Connecticut. The court has jurisdiction based on the plaintiff's residence in this state for over a year prior to bringing this action. The parties are the parents of three minor children, all issue of the marriage, to wit:
 Mitchell Morrissey, d/o/b — 2/25/80 Paul Morrissey, d/o/b — 8/18/81 Samantha Morrissey, d/o/b — 8/5/86
No other child has been born to the defendant since the date of the marriage, nor has the State of Connecticut ever advanced any assistance or aid. The marriage has broken down beyond repair with no expectation of reconciliation, although the parties are at issue regarding responsibility therefor as well as when it occurred.
A decree is entered dissolving this marriage on the ground that the marriage has broken down irretrievably. The defendant's cross complaint is dismissed as now moot.
The parties had arrived at an agreement concerning custody and visitation which was reported to the court on May 14, 1991 at the commencement of the trial which was accepted by the court. The following agreed terms are ordered as part of the judgment.
1. Legal custody of the minor children is awarded to both parents, with physical custody awarded to the defendant.
2. Liberal visitation rights are awarded to the plaintiff. Such visitation rights shall include:
 (a) One school night per week overnight beginning at 5:00 p.m. and ending the next morning with plaintiff returning the children to their morning school.
 (b) Alternating Friday and Saturday overnight such as to insure one overnight weekend visit per week.
 (c) Two weeks of uninterrupted vacation per year by each parent with the three children. Each parent to provide reasonable advance notice to the other annually of their vacation schedule.
 (d) Alternating legal holidays. (Holidays as defined by statute.)
The parties also agreed and the court accepted the following which is ordered: CT Page 6627
3. The plaintiff shall maintain medical insurance coverage at his expense for the benefit of the three (3) minor children until they attain the age of eighteen (18) years. Plaintiff and defendant shall equally divide and pay any uninsured, unreimbursed medical, dental, optical, orthodontia, prescription, or psychological or similar such expense provided the same is reasonable and necessary. The defendant agrees to consult with plaintiff with regard to such medical expenses in advance unless the same are of an emergency nature.
The parties shall share equally any uninsured medical expenses incurred in the care of the children's health.
 II.
The plaintiff received a B.S. Degree in accounting from Boston College in 1974 and married the defendant in August of that year. The plaintiff found employment with a large accounting firm in Hartford as an auditor. After two years of junior college education, the defendant became a legal secretary for a patent law firm. They lived in an apartment in Glastonbury during the first three years of marriage until their first home was purchased in West Hartford where they lived for the next 18 months. The house was purchased with the parties' savings being used.
The family moved to 184 Hilltop Drive, Southington which was purchased by utilizing a $70,000 mortgage, the profit from the West Hartford house, stock market profits and savings for a total price of $92,000.
Each party had the home appraised in preparation for trial. Mr. Robert J. Nocera, the plaintiff's real estate expert witness, concluded that the property had a fair market value of $230,000. Mr. Matthew Welinsky, the defendant's real estate expert witness, estimated the fair market value to be $195,000.
The comparable sales used by the plaintiff listed three sales, two of which were 3.5 miles and 2.25 miles from the parties' home. The third comparable stated to be 0.4 miles away on Canterbury Lane, is a street the court could not find on either the Nocera report or the Welinsky report locator map. Said comparable sale of September 17, 1990 was new construction, contained 9 rooms including four baths, totaling 2,743 sq. ft. with central air conditioning. To make it comparable with the subject property, which is 18 years old, eight rooms with 2.5 baths, 2,120 square feet and no central air, Mr. Nocera made adjustments of $47,500 less $3,000 credit for a "Half Framed" basement, or $44,500 net adjustments deducted from the Canterbury sale of September 17, 1990 to arrive at an indicated value of CT Page 6628 $234,500.
The court finds Mr. Welinsky's comparables much more persuasive. All three are from the same subdivision and one of the same age and style. The sale at 456 Hart Street occurred on August 31, 1990, 17 days before the Canterbury sale but was not mentioned in the Nocera report.
The court concludes that the home's fair market value is $195,000. It is encumbered by a mortgage with a balance of $121,000. The not equity is therefore found to be $74,000.
The plaintiff's parents were the owners and operators of an incorporated business they acquired in 1962 shown as The Waterbury Printing Company located on premises the corporation owned known as 192 Willow Street, Waterbury. The plaintiff's father characterized the nature of the business as "job printer".
After Morrissey family discussions among plaintiff, defendant, plaintiff's sister and her husband, and plaintiff's parents, the plaintiff was invited to come work in the family business. He accepted by leaving public accounting to begin work at Waterbury Printing in November, 1978. The plaintiff's father has remained active in the management of the business working more than 40 hours weekly. For a period of time in 1984, the father had a health problem during which time his wife and the plaintiff ran the business. At present he professes to enjoy good health and his appearance, and demeanor on the witness stand appeared to confirm his good health. He described how he taught his son the business with both working 55 hours weekly. The plaintiff's mother died on July 13, 1987 and shortly thereafter the plaintiff received shares representing 49% ownership of the business. His father retains the remaining 51% of the stock.
The corporation pays the plaintiff a weekly gross salary of $1,680, withholding of $382.76 and FICA of $88.02 deducted, leaving $1,209.22 weekly net disposable cash income. In addition, he receives memberships at various fraternal and social organizations paid by the corporation. The court finds no significant cash sales by the corporation nor does the court find any "off the books" receipts which should be charged to plaintiff as additional income.
The defendant has returned to work as a legal secretary at a weekly gross wage of $480.77, and $381 after taxes, but before day care expenses.
The court concludes that the plaintiff's earning capacity greatly exceeds the defendant's and this situation will continue to exist in the future. CT Page 6629
 III.
The plaintiff qualified Michael J. Maunsell, C.P.A., the corporation's outside accountant, as an expert to give an opinion of the value of the corporation and the plaintiff's interest. He averaged the after tax income of the business for 1986 through 1990 to arrive at $21,172. He then capitalized the average earnings using a factor of 5, to arrive at capitalized earnings of $105,862. (Plaintiff's Exhibit R).
The not income figures used were also net officers' salaries, insurance coverages of officers and sales promotion such as membership dues.
 "In a closely held corporation, where profits are more likely to be distributed in the form of salaries and fringe benefits, the amount of surplus available for distribution in the form of dividends may be of little or no consequence." Turgeon v. Turgeon, 190 Conn. 269, 276.
The same may be said of net profits, which are little more than what's left after the plaintiff and his father are paid their salaries.
Second, the Maunsell appraisal estimates the corporation's building at $200,000. Plaintiff's real estate expert's appraisal of the same real estate, dated May 6, 1991, (Plaintiff's Exhibit P), estimates the fair market value at $252,000 thereby calling into question the Maunsell assumption of $200,000. There is no mortgage on the real estate.
The Maunsell appraisal next assigns $191,475 to the equipment referencing a 1986 appraisal which, as of May, 1991, is five years old, causing the court to question its reliability.
The Maunsell appraisal adds the building estimated value of $200,000 and the equipment value of $191,475 totaling $391,475.
The formula then applied is stated as follows:
 "COMPUTATION OF PER SHARE VALUE WITH WEIGHTED AVERAGE OF 75% CAPITALIZED EARNINGS AND 25% MAJOR FIXED ASSETS."
The same computation, stated another way, discounts the average capitalized earnings by 25% and discounts the major fixed assets CT Page 6630 by 75% of their stated value. The court finds these discounts to be arbitrary.
The formula produces a total value of the company of $177,265. The appraisal then discounts the 49% minority interest of the plaintiff by 50% due to non-marketability and ineffective control of management. The plaintiff's 490 shares are valued at $42,312 (i.e. 490 shares at $86.35 each).
As her expert witness on this issue, the defendant called Stephen J. Miller, Esquire who is an attorney admitted to practice in this state and a Connecticut C.P.A. He has been in private practice since 1979, limiting his practice to closely held corporations and taxation including estate planning, pension and disputes with the Internal Revenue Service.
In valuing a closely held business, the witness acknowledged the authorities considered the concept of "discounted cash flow", i.e. the projection of earnings and cash flow into the future and apply an appropriate discount as the most acceptable way to arrive at a value. The witness testified that method relied too heavily on conjecture. He favored a "normalized earnings" approach, which recognizes that owners of closely held businesses tend to run personal expenses through the business. The starting point for valuation then is income from operations rather than net income. The sales less the cash expenses incurred to create those sales equals the gross profit which is also the actual cash flow of the business. The depreciation deducted is added back since it is a non-cash item. Officers' salaries, travel and entertainment and auto expense are all added back to arrive at "true cash flow". The witness then deducted a replacement officer salary, i.e. the cost to replace the owner as manager of the business. After deducting the replacement's salary, the remaining cash is called adjusted cash flow. The process was applied to the printing company figures for fiscal years 1986 through May 31, 1990, (Defendant's Exhibit #1), resulting in an average adjusted annual cash flow of $152,605.00.
The next step in valuation is asset analysis, starting with total assets on the books as of the most recent financial statement of May 31, 1990 less the liabilities on the books providing net book value. One asset was the real estate carried at cost of $84,000 less depreciation. The actual total amount of depreciation was not available so the witness estimated present book value to $35,000 which was subtracted and the $252,000 fair market value was added back, resulting in adjusted net book value of $441,717.
The witness then applied three different means of arriving at a value for the business. The first method is called "Excess CT Page 6631 Earnings Approach". The expert's opinion was that a fair return on the business' assets was 12.4%, or $55,214. Having previously determined that $151,605 was the actual average adjusted annual cash flow, the excess of $97,391 was called "good will" or the ability of a business to generate a return on investment greater than a normal return. Applying a five time multiplier to the good will or excess return, $486,955 is the resulting figure, when added to the adjusted netbook value of $441,717 produces a value of $928,672 for the business.
The second method used was a capitalization of earnings rate of 6.15 or a 16.25% return on capital. This method considers the lack of marketability by comparing the price/earnings ratio (i.e. PE) of a listed security with the price earnings ratio of this company. Since that ratio is the inverse of the capitalization rate of 16.25% the price/earnings ratio of the printing company would be 6.15. The bid and asked prices of a listed security furnish the PE. In the present case, the expert's opinion provides earnings of $152,605.00 or $152.605 per share. By applying the 6.15 multiplier, the share value is $939.11 per share. Said another way, to produce $152,605, an investment of $939,107.00 is needed.
The third method employed by the defendant's expert is a hybrid he labelled "book value/earnings combination" which is the adjusted net book value, $441,717 added to three times the average annual cash flow (i.e. 3 x $152,605) of $457,815 for a value of $899,523.
In arriving at his final opinion, Attorney Miller totalled the three valuations, divided by 3, and arrived at a per share value of $922.43 which, for plaintiff's 490 shares, is $451,990.
No further discount was then applied although the plaintiff's shares are a 49% minority interest. The witness' opinion was that, in light of present day law and litigation, the minority stockholder is no longer at the mercy of the majority stockholder. Such observations may be true, but to deny a discount while allowing that the purchaser may be also buying a lawsuit is not recognizing the fact that this is a family business with the 51% owner actively participating in the business. The court adopts a middle ground and concludes that a 33-1/2% discount is realistic.
Having analyzed the opinions of both experts, this court has concluded that:
 "Since valuation of securities is, in essence, a prophecy as to the future it is important that the prognostication be based on an examination of the CT Page 6632 appropriate financial tea leaves." Turgeon at p. 276
and that Attorney Miller's tea leaves are more reliable, more convincing and more thorough. The plaintiff is the owner of an interest in Waterbury Printing Company that the court values at $451,990 less the 1/3 discount or $301,327.
 IV.
The next asset in dispute is a condominium unit the parties acquired by deed dated May 23, 1984, (Plaintiff's Exhibit C-1) obtaining a $50,000 mortgage (Plaintiff's Exhibit C-2) to finance the purchase price of $110,000 (Plaintiff's Exhibit B). The plaintiff's father provided $58,000, the balance of the cash over the parties' $5,000.00. The plaintiff now claims his father is 50% owner with the parties. The father made a similar claim on the witness stand.
In 1988, the parties refinanced their Southington home to raise sufficient cash to pay off the unit's mortgage.
There is no paper trial to substantiate the plaintiff's version of ownership being shared with his father. The father testified that it was done for tax purposes, but that he would never bring suit to claim a resulting trust. The conduct of the parties is consistent with the defendant's claim that she and the plaintiff own the unit. As the plaintiff paid nothing for his interest in the business, the same can be inferred that the plaintiffs father made a gift of the funds to purchase the Rhode Island condo unit. Both parties list the fair market value on their respective financial affidavits as being $161,000. The court so finds the Rhode Island condo unit's value to be such.
 V.
The parties are also at odds over the causes for the breakdown of the marriage. The defendant went to Newport, Rhode Island for a few days in April 1990. On May 3, 1990, the defendant told the plaintiff that she had been involved with another man in an extramarital affair but it was ended. She had met her paramour while attending a Dale Carnegie course. The husband compared the list of attendees at the course with his home phone bill calls made to the paramour on the parties' line to determine to whom the defendant was calling.
The relevation depressed the plaintiff, he sought medical treatment and was placed on medication. The parties also obtained marriage counseling for the following two or three months. The plaintiff increased his consumption of gin, alluding to its CT Page 6633 ability to help him sleep.
After determining that the defendant was continuing the liaison, the plaintiff moved from the family home on or about July 15, 1990. The writ and complaint were issued on September 13, 1990.
Although defendant's affair was devastating to the plaintiff, the early warning signs of the approaching breakdown were present for some time. The many demands made upon the plaintiff's time by his business and by his many community activities allowed little time at home, but that available time was devoted, in part, to a daily "unwinding" with one to four alcoholic drinks of gin and tonic consumed. This pattern of drinking began in 1984 (c.f. Plaintiff's Exhibit T, a glass). An undercurrent of sexual incompatibility was also present throughout the marriage, which the parties discussed, and of which the defendant complained, but the issue was never resolved. The plaintiff never realized the severity of the incompatibility until he read the defendant's deposition.
Suffice it to say that, although plaintiff's drinking habits, lack of ability to express affection, and his community activities outside his home did not excuse his wife's infidelity, it did supply the rationalization and emotional frustration to the defendant to allow her to succumb to the attentions of another man. Consequently, she must bear a greater share of the responsibility for the marriage breakdown although the plaintiff is not without fault. Even so, fault or adultery is only one of the factors to be considered by the court in ordering an assignment of property or an award of alimony. Venuti v. Venuti, 185 Conn. 156,158.
The plaintiff has more formal education, greater vocational skills, and will continue to have a greater amount and more sources of substantial income in the future.
It is also proper to take into consideration the history of financial contributions from the plaintiff's family, McGinn v. McGinn, 183 Conn. 512, 513.
 VI.
The court has also determined that, in framing the orders, a denial of the defendant's request for an award of counsel fees would undermine its other orders. Turgeon, supra, at 281.
Having reviewed the evidence in light of the statutory criteria, the court enters the following financial orders.: CT Page 6634
1. The plaintiff shall pay to the defendant the sum of $151.66 per child per week for a total of $455 weekly child support. A wage withholding is ordered as required by Section52-362, Connecticut General Statutes which shall be contingent. The court's order is based on the guidelines, the parties' net disposable incomes, and after allowing defendant the day care expense.
2. The plaintiff shall maintain medical insurance as recited as part of the custody agreement.
3. The plaintiff shall be entitled to claim Mitchell and Samantha as dependents for income tax purposes and the defendant may claim Paul. This order is subject to modification if child support should become subject to court review.
4. The plaintiff shall pay to the defendant the sum of $145 weekly periodic alimony for 208 weeks and the sum of $95 weekly periodic alimony for an additional 104 weeks, unless sooner terminated by the death or remarriage of the defendant. The term of 312 weeks shall be non-modifiable.
5. The plaintiff's interest in 184 Hilltop Drive, Southington, Connecticut is awarded to the defendant who shall be solely responsible for payment of the mortgage thereon. The plaintiff shall execute and deliver a quit claim deed to the defendant, prepared at the plaintiff's expense.
6. The contents of the Southington house are awarded to the defendant as her sole property.
7. The defendant's interest in the condominium unit located in Jamestown, Rhode Island is awarded to the plaintiff along with the contents of the unit.
8. The plaintiff shall retain his interest in Waterbury Printing Co. as his sole property.
9. The plaintiff shall pay to the defendant the sum of $100,000 as lump sum alimony, payable in four equal installments, without interest, the first payment due 30 days from date and thereafter the remaining installments shall be due in six months intervals.
10. The I.R.A. accounts shall be divided equally between the parties.
11. The Bank of Waterbury stock is awarded to the defendant as her sole property. CT Page 6635
12. The plaintiff is awarded the 1988 Chevy Blazer motor vehicle and he shall be solely liable for the loan balance thereon.
13. The defendant is awarded the 1987 Volvo wagon.
14. The plaintiff is ordered to pay to the defendant the sum of $15,000 as an allowance to defray legal expenses and the further sum of $3,500 to defray expert witness costs. Said payments shall be due in 60 days.
15. The plaintiff shall maintain $300,000 face value life insurance insuring his life, naming the three minor children as equal irrevocable beneficiaries at least until the youngest attains majority. He shall provide the defendant with such authorization as necessary so the defendant may be kept advised of payment of premiums and that the policy or policies remain in full force and effect.
16. The zero coupon bonds itemized on the plaintiff's financial affidavit shall remain for the benefit of the children's education and shall be established as irrevocable trust funds for the children under the Uniform Gifts to Minors Act.
17. Each party shall retain their other assets as their own, and shall pay their other debts not mentioned in the foregoing orders.
The plaintiff has submitted, as part of his claims for relief, an offer to pay all of the children's college expenses including those expenses to be incurred for each child post majority. Absent a written agreement of the parties, the court has no jurisdiction over post majority education expenses. Section46b-66 Connecticut General Statutes; Albrecht v. Albrecht,19 Conn. App. 146, 154-155.
Counsel for the plaintiff is directed to prepare the judgment file.
HARRIGAN, J.