[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff husband, 55, and the defendant wife, 53, married on June 26, 1965 in Yonkers, New York. The plaintiff has resided in this state for over one year prior to commencing this action for dissolution by complaint dated January 4, 1994, thereby satisfying § 46b-44. The parties had one child who is now an adult. The marriage has broken down irretrievably.
The plaintiff, a college graduate, was employed in a family printing and commercial advertising business at the time of the marriage.
In 1969 the plaintiff enrolled in Columbia University and obtained a Master in Science degree in public health. He made this career change due to a desire to leave the family business. He was tested at N.Y.U. for occupational aptitudes and the testing service recommended hospital administration. The plaintiff was hired by a hospital in Tarrytown, New York in 1968. In 1971 the plaintiff became employed at Misericordia Hospital in Bronx, New York as Assistant Administrator at an annual salary of $17,000.00 due to a change in management. When he left in August, 1978, he was a vice president at an annual salary of $70,000.00. He then worked for ARCA marketing medical malpractice for hospitals until March, 1980 when he was hired as Associate Executive Director of a hospital complex located on Staten Island, New York at a starting salary of $50,000.00. When the plaintiff left that employer in 1987, he was CT Page 11276 Executive vice-president and C.O.O. earning $100,000.00 annually. The plaintiff was always on call via beeper and he described his responsibilities as stressful. The plaintiff explained that the commute from Darien to Staten Island became too burdensome and the defendant would not consider moving closer to his work.
From 1988 until the time of trial the plaintiff had no meaningful employment. He was searching for a business venture he could operate as an entrepreneur, and, until November, 1993, was performing some work for the defendant in her business. He sought the assistance of two head hunters in locating employment. From November, 1993 until August, 1995 he had received no offers of employment. The plaintiff was employed by the defendant's corporation on the payroll in 1993 until November, 1993.
On April 4, 1994 the court entered a pendente lite order directing the defendant to pay to the plaintiff $200.00 weekly alimony, effective March 7, 1994; to keep the current health insurance in effect for the plaintiff's benefit; and to continue the existing arrangement regarding house expenses. The defendant paid the order until August 21, 1995 when the plaintiff began working for St. Luke's Health Network located in Bethlehem, Pennsylvania for an annual salary of $55,000.00 as Director of Practice Management. As a condition of employment the plaintiff agreed to resign after one year's employment if the employer determines that he has not met their expectations, (Plaintiff's Exhibit #33). He has a full range of benefits including medical insurance, life insurance, disability insurance, dental insurance, sick time, vacation, pension plan, and other benefits, all subject to various waiting periods.
The defendant, a high school graduate with 2 years of college credits, was employed by American Airlines for 13 years until 1974 when her department was moved to Oklahoma. She found employment as a bookkeeper from 1974 until 1979.
In 1977, the parties adopted their son David. He had several health problems and proved to be a difficult child to rear. The defendant found employment during this time with a dress shop which enabled her to work at home until 1984.
In 1983 the defendant and a partner started a fabric store, branching into the making and renting of table cloths. By 1984 the plaintiff was running her own business of manufacturing and renting tablecloths known as Tabletoppers, Inc., a business that she CT Page 11277 continues to operate until the present time.
The plaintiff presented evidence through an expert witness, Edward M. Axelrod, C.P.A., who valued the business. He employed a measure he characterized as "fair value", not "fair market value". The court finds no authority for the method and no precedent is found for this theory. His written report states that he used the capitalized earnings method to approximate the value as ". . . I estimate the value of the linen rental business, Tabletoppers, Inc. to approximate $245,000.00 plus appraised value of linens in excess of $68,300.00 and the remaining stockholder's equity." (Plaintiff's Exhibit #26) The capitalization of income approach is an accepted method for valuing a going concern, Turgeon v. Turgeon,190 Conn. 269. That case also cited the liquidation of a "one man" business (Normand Turgeon was the sole stockholder) as an acceptable basis if the future of the business is doubtful absent the sole stockholder.
The court's difficulty with the Axelrod report is the failure to deal with the inventory and "remaining stockholder's equity" in arriving at a evaluation.
The defendant also presented Paul Prisecki, C.P.A. as an expert witness who explained that "fair value" is employed in valuing a minority stockholder's interest but he is unaware of any other application of the concept. However, in analyzing the same figures prepared by the plaintiff's expert errors were uncovered in the defendant's report.
The plaintiff then recalled his expert witness who testified as to the assumptions he used weighting of years "5-4-3-2-1". He criticized the defendant's expert's employment of "4-3-2-1-0" which eliminated the year 1991. The object of the exercise was to arrive at a divisor. After listening to all the experts' testimony the court has concluded that neither expert's opinion is unbiased and therefore the court has been unable to totally credit either opinion as to value. However, the court is satisfied that a value of $150,000.00 fairly recognizes the business as a "one woman" operation, a finding that is supported by the record, and which the Axelrod analysis fails to give reasonable weight.
The parties purchased their present marital home in 1971 utilizing $10,000.00 from defendant's savings and $5,000.00 from the plaintiff's and paying $46,000.00 in total. The plaintiff testified that $114,000.00 of improvements have been made to the CT Page 11278 property which the court accepts as accurate. The plaintiff states the present fair market value to be $330,000.00 with a remaining mortgage balance of $35,000.00. The defendant pegs the fair market value at $310,000.00. Averaging both estimates, the court finds the present fair market value to be $320,000.00.
Another substantial asset was created as a result of serious injuries suffered by the defendant in an auto accident that occurred on December 21, 1988. She was unable to work until the following May. The plaintiff kept the business running during this recuperation period. The net recovery to the plaintiff for her damages was $348,000.00. The plaintiff and the son each received $10,000.00. It was not explained whether the plaintiff's settlement included a loss of consortium claim. In order to have this fund professionally managed the defendant hired a money manager, who was given $400,000.00, his minimum. The defendant's affidavit lists the value of the fund, as of June 1, 1995 to be $514,097.00.
The plaintiff owns a 1989 Buick valued at $2,000.00; a savings account containing $8,000.00; mutual funds valued at $17,419.00; a profit sharing account of $4,113.00; an IRA of $13,636.00; a Prudential TDA of $38,157.00; and a Prudential Trust TDA of $201,862.00.
The defendant lists an IRA of $11,919.00; a bank account of $4,000.00; a credit union account of $2,875.00; and Tabletoppers, Inc. profit sharing and money purchase plan of $153,500.00. The defendant's valuation of the Tabletoppers Inc., Corporation, listed on her financial affidavit is found to be artificial and of no help to the court. The parties decline to value the contents of the home, except the plaintiff lists "Silver (joint) (1/2) $1,250.00" and "Japanese Silk Screen (joint) (1/2) $900.00."
The plaintiff cites Raccio v. Raccio, 41 Conn. Sup. 115
(1987) as authority for his claim to part of the negligence settlement fund. That case can be distinguished from the present case for the following reasons. Mr. Raccio, the plaintiff, was rendered totally and permanently disabled by a workplace accident. In addition to the Workers' Compensation award that he was receiving, he had brought suit against an alleged tortfeasor on a product liability theory. The tort action was pending at the time the Raccio dissolution action was tried as a "limited contested" case (quotes in original). The defendant sought alimony and/or a property award pursuant to § 46b-81 and § 46b-82, C.G.S. Mr. CT Page 11279 Raccio's claim was unliquidated and the issue was whether an unliquidated personal injury action may be subject to an award. Raccio held that the claim was subject to an award pursuant to § 46b-81.
The court then found that Mrs. Raccio had no marketable skills, little job training and is handicapped. It then noted that Mrs. Raccio had a substantial loss of consortium claim but that the impact upon her exceeded her claim.[1]
In the present case, the defendant's claim was liquidated several years ago. The defendant's losses involved serious and permanent damage to her leg which limited her physical recreational activities for the rest of her life. During her convalescence the plaintiff kept the business running. Her earning capacity does not appear impaired by the injury. The pain and suffering was hers alone to endure. This court concludes that there is little basis to award a substantial share of the tort fund to the plaintiff if the theory behind the award is to recognize the portion attributable to lost earnings and medical expenses. The fund is marital property but its division is impacted by the considerations just cited.
The plaintiff's period of unemployment from 1988 until 1995 was not entirely a life of indolence. He was devoting time to meeting the son's needs. He helped out in the defendant's business to some extent by making deliveries and pick-ups, and he did explore several small business ventures. He described himself as depressed. No clinical evidence was presented. He did use head hunters on two occasions.
Although the court does not accept the plaintiff's argument that a role reversal occurred, for the defendant continued to perform her homemaking duties, until a housekeeper was hired around the time of her accident, the court will give some credit for the plaintiff's efforts. Not to be overlooked is the plaintiff's prior employment that demonstrated an earning capacity of over $100,000.00. These earnings were devoted to the support of the family. In 1993 the defendant wanted to end the marriage. When the defendant fired the plaintiff in November, 1993, the court concludes that, as the plaintiff testified, she was tired of supporting the plaintiff. The court further concludes that the marriage was irretrievably broken down by the end of 1993.
Each party has had health problems but both parties are now in CT Page 11280 reasonably good general health. It should be noted that the defendant had uterine cancer ten years ago but has been in post operation remission since then.
Having reviewed the evidence in light of the statutory criteria, the court enters the following judgment.
1. A decree is entered dissolving the marriage on the ground alleged in the complaint, all its allegations being found proven. The cross-complaint is dismissed as moot.
2. The plaintiff shall retain all of the assets that are in his name solely.
3. The defendant shall retain all of the assets that are in her name solely.
4. The defendant is awarded the plaintiff's interest in 7 Shady Lane, Stamford, Connecticut. The defendant shall pay to the plaintiff the sum of $158,000.00 due on or before January 10, 1996 in exchange for his deed. The defendant shall be responsible for the property and shall maintain homeowner's insurance for both parties until the delivery of the deed.
5. The defendant shall pay the sum of $150,000.00 to the plaintiff as his share of the remaining marital assets, which payment shall satisfy any unpaid pendente lite alimony, payable on or before January 10, 1996.
6. Since neither party assigned any value to the contents of the marital home the court awards the contents to the defendant, including the silver the plaintiff did value on his financial affidavit.
7. No periodic alimony and no allowance to prosecute is awarded.
8. Counsel for the plaintiff shall prepare the judgment file and the quit claim deed.
HARRIGAN, J.