# THERESA TURGEON v. NORMAND TURGEON
## (10678)
## (11358)

SPEZIALE, C. J., PETERS, HEALEY, PARSKEY and SHEA, Js.

Argued March 1—decision released June 7, 1983

The appellant filed a motion for reargument which was denied.

*Vincent F. Sabatini,* with whom, on the brief, was *Michael P. Carey,* for the appellant (defendant).

*Barclay Robinson, Jr.,* for the appellee (plaintiff).

PARSKEY, J. The plaintiff and the defendant, who had been married for more than twenty-three years, were granted a dissolution of marriage on February 19, 1981, on the ground of irretrievable breakdown. The major marital assets at that time consisted of the family home in Wethersfield, a greenhouse on the Berlin Turnpike and a machine shop in New Britain. The trial referee assigned the residence to the plaintiff, gave the greenhouse and the machine shop to the defendant, and ordered the defendant to pay the plaintiff $100,000 in lump sum alimony, payable in installments over a period of seven years, an additional $40,000 in two installments over a period of six months, counsel fees of $10,000 and $1500 for expert fees. In his appeal the defendant challenges the monetary awards both individually and in the aggregate. He also challenges the referee's failure to find the plaintiff guilty of adultery. Following the dissolution, the trial court, *Covello, J.,* denied the defendant's motion for modification of the alimony award, adjudged the defendant in contempt for failure to pay the ordered monetary awards and prohibited the defendant from further encumbering the property of the machine shop. In a separate appeal, which has been consolidated with the earlier one, the defendant has challenged the trial court's actions.

## I

## THE ALIMONY AWARD

The defendant has mounted a two-pronged attack on the alimony award. He claims first that the referee made an erroneous valuation of the machine shop business by admitting into evidence a document which inaccurately projected future earnings of the business and by relying on the opinion of an expert who utilized an inappropriate method of valuation. Second, he claims that the referee awarded to the plaintiff an excessively disproportionate share of the marital assests.

## A

### THE MACHINE SHOP

The defendant, who is in good health, is an expert machinist. When he and the plaintiff were married he was employed as a machinist. In 1956, the defendant and four other men formed New England Precision Products, Inc. (NEPP). They rented space and each one invested $3500. Each man had an outside job and so each one contributed ten hours a week to their new venture. In June of 1957, the defendant gave up his regular job and devoted at least fifty to fifty-five hours a week to NEPP until the end of 1957 when he took another outside machinist job and then devoted only ten to fifteen hours a week to NEPP. This was due to insufficient income from NEPP.

In 1966, NEPP grossed about $30,000. In the early 1970s the plaintiff and the defendant discussed the possibility of the defendant taking over the complete ownership of NEPP. The defendant bought out his associates in September, 1973, and became owner of all the outstanding corporation stock. In order to accomplish this, he had to borrow money. At this time

NEPP had a gross income of between $60,000 and $100,000. It employed one man and the defendant, who, besides working as a machinist and seeking business, also took care of the company books. By the end of 1973, two additional men were hired. In 1974, the gross income was $125,000 and the defendant hired a sales manager. In 1975, the company gross was $250,000 and increased each year when, in 1979, the gross was $599,000. The income for the year of 1980 suffered because of the distress caused the defendant by the pending lawsuit.

The defendant's skill and know-how have been a major force in developing the business of NEPP. The company, which is located in New Britain, has a lease that may be renewed until 1987. In 1980 and 1981, the company was a viable and going business and had shown development under the defendant's guidance. This had been due to the defendant's skill and the long hours which he had devoted to his task. The defendant's gross weekly income was $750. In addition, many purchases and items of family expense had been paid for by NEPP.

## B

### VALUATION OF THE MACHINE SHOP

Both parties used appraisal experts to evaluate NEPP. Bernard McTeague testified for the plaintiff that by using the capitalization of income approach the company had a value of $250,000 as a going concern. Robert Hadley testified for the defendant that in his opinion the company had a greater value if it were liquidated than if it remained a going concern and that by using the liquidation approach he arrived at a figure of $133,000. The reasons Hadley gave for rejecting the income approach were that the average net earnings of the company for the years 1974 through 1979 were

too low to justify treating it as a profitable enterprise, that the company is a "one-man" business and that without the defendant's knowledge, local contacts and management skills it was not likely that the business would continue. The referee, however, accepted the McTeague valuation.

The referee admitted into evidence a document containing financial projections of NEPP for the years 1979 and 1980. This document, which was prepared by certified public accountants from estimates and assumptions made by the defendant, had been submitted by the defendant to the Connecticut development commission as part of a loan application made to the commission by NEPP. The defendant challenged the admission of the document on the ground of relevancy, arguing that in view of the admission of other exhibits showing the actual earnings of the company for the year 1979 and for the first nine months of 1980 the defendant's projections should be rejected as worthless. The defendant's downgrading of his own financial estimates need not be accepted at face value. The fact that the defendant thought enough of these projections to use them as a basis for a substantial loan application suggests that they were entitled to be taken seriously. Additionally, an examination of the projection for 1979 when compared with the actual results for that year demonstrates that, if anything, the projection was on the conservative side, showing, for example, gross sales of $540,000 and net income of $23,000 as against actual sales of $599,000 and actual net income of $73,500. Relevant evidence must be logically probative and sufficiently significant to aid the trier in the determination of a fact in issue. *Pitt* v. *Kent,* 149 Conn. 351, 357, 179 A.2d 626 (1962). In determining whether a specific piece of evidence is relevant the trial court exercises a broad discretion. *Delott* v.

*Roraback,* 179 Conn. 406, 414, 426 A.2d 791 (1980). In admitting the document in question the trial court acted well within its discretion.

The defendant challenges the court's acceptance of McTeague's valuation of the machine shop on two grounds. First, he asserts that there was an insufficient factual basis for utilization of the income approach. Second, he contends that even assuming the appropriateness of the income approach, the use by McTeague of an erratically high earnings year (1979) as an income base produced a distortion in the capitalized value of the business.

"In assessing the value of . . . property . . . the trier arrives at his own conclusions by weighing the opinions of the appraisers, the claims of the parties, and his own general knowledge of the elements going to establish value, and then employs the most appropriate method of determining valuation. *Esposito* v. *Commissioner of Transportation,* 167 Conn. 439, 441, 356 A.2d 175 [1974]; *Textron, Inc.* v. *Wood,* 167 Conn. 334, 345, 355 A.2d 307 [1974]. The trial court has the right to accept so much of the testimony of the experts and the recognized appraisal methods which they employed as he finds applicable; his determination is reviewable only if he misapplies, overlooks, or gives a wrong or improper effect to any test or consideration which it was his duty to regard." *Greenfield Development Co.* v. *Wood,* 172 Conn. 446, 451, 374 A.2d 1084 (1977). We have approved the capitalization of actual income as an appropriate method of valuation. *Uniroyal, Inc.* v. *Board of Tax Review,* 174 Conn. 380, 386, 389 A.2d 734 (1978); *Somers* v. *Meriden,* 119 Conn. 5, 7-8, 174 A. 184 (1934). In the present case the defendant's company was, at the time of its valuation in 1980, a going concern. There was no evidence that it was in the process of liquidation. Although the trier was not

obliged to accept the income approach he was not precluded from doing so merely because the company is a closely held, "one-man" business.

The defendant does not seriously challenge the use of the income approach for valuation of a going concern. Indeed, the defendant's expert, Hadley, utilized this approach but rejected the valuation based on it because, in his view, an appraisal of the assets using the liquidation value approach would produce a higher valuation. Since both McTeague and Hadley agreed that a capitalization multiplier of five would be appropriate, the narrow issue before us is whether there is any evidence in support of a finding of annual net earnings of $50,000.

In reaching his conclusion that the basic after-tax annual earning power of the company was $50,000, McTeague relied on the financial statements of the company for the years 1977, 1978 and 1979. These showed sales of $325,000, $404,000 and $600,000 respectively, officer's compensation of $25,000, $32,000 and $36,000 and net income of $3000, $7800 and $74,000. McTeague also relied on the defendant's projections for the years 1979 and 1980 which showed sales of $540,000 and $650,000, officer's salary of $39,000 and $40,000 and a net income of $23,000 and $55,000. Finally, McTeague relied on his analysis of the upward trend of the company business during the years he examined, his knowledge of economic data specifically relating to the metal products industry and his familiarity with general economic conditions.

Fair market value, that is, the price that would probably result from fair negotiations between a willing seller and a willing buyer; Gebrian v. Bristol Redevelopment Agency, 171 Conn. 565, 571, 370 A.2d 1055 (1976); involves a question of fact. Id. As with other questions

of fact, unless the determination by the trial court is clearly erroneous, it must stand. *Kaplan* v. *Kaplan,* 186 Conn. 387, 392, 441 A.2d 629 (1982); *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 221, 435 A.2d 24 (1980); Practice Book § 3060D.

It is generally recognized that closely held corporate stock cannot be valued reasonably by the application of any inflexible formula. *Snyder's Estate* v. *United States,* 285 F.2d 857, 861 (4th Cir. 1961); *O'Malley* v. *Ames,* 197 F.2d 256, 258 (8th Cir. 1952); annot., 22 A.L.R. Fed. 31, 44 et seq. Since valuation of securities is, in essence, a prophecy as to the future; Revenue Ruling 59-60 § 3 (26 C.F.R. 2031–2032); it is important that the prognostication be based on an examination of the appropriate financial tea leaves. While prior earnings records usually are the most reliable guide as to future expectancy, resort to arbitrary five or ten year averages without regard to recent trends is not likely to produce a realistic valuation. Id., § 4.02(d). In a closely held corporation, where profits are more likely to be distributed in the form of salaries and fringe benefits, the amount of surplus available for distribution in the form of dividends may be of little or no consequence.

The financial statements of the company from 1977 through 1979 show a steady increase in gross sales. These statements also reflect a steady increase in compensation for the defendant during the same period. There was also evidence before the trier that, in 1980, compensation to the defendant by way of salary and other benefits amounted to $70,000. The defendant's projection for 1980 showed gross sales of $650,000 and a net income of $55,000. Taking all of these factors into account it cannot be said that the trial court's acceptance of the $50,000 annual earning figure, even if somewhat high, was clearly erroneous.

The defendant makes the point that the actual financial figures for the first nine months of 1980 demonstrate that the rosy picture portrayed in 1979 was an aberration, an erratic spike in an otherwise rather flat economic condition and that the defendant's own projection for 1980 bore very little relationship to reality. If the defendant's point were well taken it would call for reexamination of the trial court's conclusions. But the defendant's point is not well taken. In January, 1980, the dissolution proceeding was instituted. That same month the defendant withdrew $35,000 from the company. In May, 1980, he put his elderly retired father on the payroll at the rate of $200 per week. He also took over the bookkeeping functions of the company. His bookkeeper testified that the defendant told her "there were ways you could put things on paper to make a company look as though it wasn't operating with a good, you know, a profit, and that he was going to try to figure out ways that could do this." He also stated that he had deliberately falsified his 1980 cash receipts ledger. Finally, it is interesting to note that, whereas in previous years the average gross profit was approximately 37 percent of gross sales and was projected by the defendant for 1980 at 36 percent, the "actual" gross profit for the nine month period is only 7 percent of gross sales of approximately $300,000.[1] It would not require unusual skepticism to view the 1980 financial statement with an abundance of reserve.

---

[1] While short-term inelasticity of overhead expenses during a period of rapidly declining gross sales might account for some of the dramatic drop in actual gross profit, in light of evidence of the defendant's financial machinations there is no reason to regard the possibility of this factor as dispositive.

## C

### FAILURE TO FIND ADULTERY

The defendant claims that the court erred in failing to find the plaintiff guilty of adultery. Since the defendant is not seeking to have the dissolution decree vacated, presumably it is the defendant's position that, were the court to find that the cause of the dissolution was the plaintiff's adultery, that finding would impact on the financial awards. We need not consider that question, however; see *Posada* v. *Posada,* 179 Conn. 568, 572–73, 427 A.2d 406 (1980); unless the defendant was entitled to a finding of adultery as a matter of law.

Adultery as a ground for dissolution under General Statutes § 46b-40 requires proof that the other spouse has engaged in extramarital sexual relations. *Brodsky* v. *Brodsky,* 153 Conn. 299, 300, 216 A.2d 180 (1966). Although, because of their clandestine nature, adulterous acts are usually proved by circumstantial evidence; *Zeiner* v. *Zeiner,* 120 Conn. 161, 165, 179 A. 644 (1935); the circumstances must be such as to lead the guarded discretion of a reasonable and just person to the conclusion of guilt. *Brodsky* v. *Brodsky,* supra, 301; *Zeiner* v. *Zeiner,* supra; *Neff* v. *Neff,* 96 Conn. 273, 275, 114 A. 126 (1921). The adulterous relationship must be established by a fair preponderance of the evidence. *Brodsky* v. *Brodsky,* supra, 301. "[I]n weighing the evidence of adultery, the court should exercise great care to see that it is not imposed upon through the intense interest of the parties to color the facts; it should not see evil where the circumstances may reasonably lend themselves to an innocent interpretation, nor, on the other hand, should it refuse to reach that conclusion which the sound and unprejudiced judgment should lead to." *Neff* v. *Neff,* supra, 276.

Adultery will not be inferred from circumstantial evidence unless there is both an opportunity and an adulterous disposition. *Eberhard* v. *Eberhard,* 4 N.J. 535, 73 A.2d 554 (1950); 24 Am. Jur. 2d, Divorce and Separation § 393; Clark, Domestic Relations § 12.3, p. 330. Moreover, the existence of both the opportunity and the inclination without more does not necessarily compel a conclusion that adultery has occurred. See *Antonata* v. *Antonata,* 85 Conn. 390, 393, 82 A. 967 (1912).

In a supplemental memorandum of decision the trial referee found that the defendant had failed to satisfy his burden of establishing his allegation of adultery. "Although there was testimony which might have supported a different finding, the trial court was not bound to accept as persuasive even testimony that was not directly contradicted." *Johnson* v. *Healy,* 176 Conn. 97, 103, 405 A.2d 54 (1978).

## D

### DIVISION OF ASSETS

The marital assets consisted of the machine shop, a greenhouse and the family residence with its contents. The total value of these assets was about $409,000. The defendant was awarded the machine shop and the greenhouse valued at $309,000 or approximately 76 percent of the total. In addition, the defendant was ordered to pay lump sum alimony in the total amount of $140,000, of which $40,000 was to be paid in 1981 (later postponed for an additional year by court order) and the balance of $100,000 without interest over a period of seven years. In his brief the defendant has presented us with a table wherein he has adjusted the property distributions to account for the additional cash payments. That table, while interesting, is not the only table that can be constructed from the evidence. Of the

$140,000 lump sum alimony, only $40,000 was to be paid currently in a single payment. Because the balance of $100,000 is to be paid over a period of seven years its present net worth when discounted at the rate of interest of 6 percent is $82,201.70. Am. Jur. 2d., Desk Book (1979) p. 415. Excluding the sums ($11,500) allocated for counsel and expert fees, which we discuss separately in this opinion; *Koizim* v. *Koizim*, 181 Conn. 492, 496, 435 A.2d 1022 (1980); and factoring the new figures into the defendant's table results in a bottom line figure of $187,000 (approximately) for the defendant and $222,000 (approximately) for the plaintiff. This is not so disparate that we may find the award to be an abuse of discretion. The defendant gains nothing from his division of assets challenge.

## II

### Counsel and Expert Fees

In determining whether to award counsel fees the trial court must consider the total financial resources of the parties in light of the statutory criteria. General Statutes §§ 46b-62 and 46b-82; *Devino* v. *Devino*, 190 Conn. 36, 458 A.2d 692 (1983); *Fitzgerald* v. *Fitzgerald*, 190 Conn. 26, 459 A.2d 498 (1983); *Venuti* v. *Venuti*, 185 Conn. 156, 440 A.2d 878 (1981). In *Koizim* v. *Koizim*, supra, 501, we stated three broad principles by which these statutory criteria are to be applied. First, such awards should not be made merely because the obligor has demonstrated an ability to pay. Second, where both parties are financially able to pay their own fees and expenses, they should be permitted to do so. Third, where, because of other orders, the potential obligee has ample liquid funds, an allowance of counsel fees is not justified.

In *Arrigoni* v. *Arrigoni*, 184 Conn. 513, 519, 440 A.2d 206 (1981), we refined *Koizim* by point-

ing out that "ample liquid funds" did not mean suffi-
cient cash to pay the attorney's bill, observing that
counsel fees could be awarded in situations where
apparently substantial funds were practically, if not
legally, obligated to meet the continuing cost of medical
care due to the spouse's permanent physical disability.

In *Fitzgerald* v. *Fitzgerald,* 190 Conn. 26, 459 A.2d
498 (1983), we further refined *Koizim* by setting forth
guidelines to aid the trial court in making its determi-
nation. We there stated (p. 34) "if, based on the total
financial resources of the parties, the trial court con-
cludes that denying an award of counsel fees would not
undermine its purpose in making its prior financial ord-
ers, the court should allow each party to pay his or her
own counsel fees. If, on the other hand, the trial court
concludes, based on the total financial resources of the
parties, that denying an award of counsel fees would
undermine its prior financial orders, then it may award
counsel fees to the requesting party."

In sum, three categories of cases should be noted,
namely, (1) those in which an award of counsel fees and
expenses is not only justified but the denial of such
award would be an abuse of discretion because it would
substantially undermine the other awards; (2) the broad
spectrum of cases in which the granting or denial of
counsel fees is within the court's discretion and there-
fore will rarely be disturbed and (3) those cases in which
for the reasons stated above the award of counsel fees
would constitute an abuse of discretion.

This case factually falls into the third category. The
assignment of property and alimony awards in the
aggregate are generous. The liquid assets being made
available are ample. The defendant, on the basis of a
gross weekly salary of $750 and of other monetary
benefits the total amount of which the trial referee did

not determine, was ordered to pay the plaintiff $40,000 in cash in one year and $100,000 in cash, over a period of seven years, $20,000 of which was to be paid the first year and the balance in a descending order of payments over the remaining period. The plaintiff, for her part, had had some business training background and has indicated a desire to engage in business activity. The trial referee found her to be resourceful, energetic and in good health and concluded that she should obtain employment for which she is fitted. Taking into account all of the foregoing circumstances, the additional award of counsel and expert fees is not justified.

## III

### MODIFICATION OF ALIMONY AWARD

Whether an award of alimony is subject to modification depends upon its nature. "Alimony consisting of a specific portion of an estate or of a specific sum of money . . . is a final judgment which the court cannot modify even should there be a change of circumstance." *Viglione* v. *Viglione,* 171 Conn. 213, 215, 368 A.2d 202 (1976). The decree ordered the payment of a specific sum of money, viz. $140,000. Like any other money judgment, once entered, it may be subject to attack on appeal, it may be opened in a limited set of circumstances or it may be vacated by motion or petition for a new trial; it may not, however, be modified.

## IV

### CONTEMPT

On April 14, 1982, the trial court, *Covello, J.,* adjudged the defendant in contempt on the basis of wilful disobedience of the court's order. The court found that, although the defendant was capable of paying the amount of money ordered, he wilfully failed to do so.

The defendant claims that, because of his inability to pay the amounts ordered, the court was not justified in finding him in contempt.

The defendant does not challenge the facts that he failed to comply with a court order and that, at the time of his adjudication, there was an arrearage of $13,966.66, consisting of $2466.66 of unpaid alimony, $10,000 for counsel fees and $1500 for expert fees. Rather, his claim is that the court was not justified in holding him in contempt because his failure to comply with the court order was due to circumstances beyond his control.

"The inability of the defendant to obey an order of the court, without fault on his part, is a good defense to a charge of contempt." *Tobey* v. *Tobey,* 165 Conn. 742, 746, 345 A.2d 21 (1974). The defendant argues that, due to the dramatic economic reverses sustained by the machine shop in 1980 and 1981, the company had become insolvent, thus depriving him of his only source of cash.

In response to the plaintiff's motion the court on March 1, 1982, entered the following order: "The foregoing motion having been heard it is hereby ordered that a finding may enter of an arrearage of $15,193. . . . Defendant shall pay arrearage on or before 3-23-82. No contempt is found today. In view of the availability of $39,000 which should be available 2-3 weeks from today on account of transfer of the Greenhouse property from defendant to his brother, and in the event that the arrearage is not paid on or before 3-23-82 the court will consider nonpayment a contempt. This matter is continued to 3-23-82 for compliance & hearing on other motions."

When the defendant appeared before the court in May, 1982, he acknowledged that he had received the

money from the transfer of the greenhouse property but claimed that he had used it to pay off an obligation which he owed to the Internal Revenue Service. The court found that the defendant was capable of complying with the court order and that he had wilfully disobeyed it. The court was justified in so finding.

## V

### PROTECTIVE ORDER

The equitable authority of the Superior Court to render such orders as may be required to protect the integrity of its judgments in dissolution matters is clear. *Koizim* v. *Koizim,* supra, 499. In June, 1982, when the parties appeared in connection with a proceeding concerning the disposition of NEPP the court issued an order that "as of this date there will be no further transfer of any machinery, principal assets, or any further encumbrance of the assets of New England Precision Products until further Order of the Court." The court was justified in issuing its order and, in appropriate circumstances, to act on its own motion, so long as the parties were given an opportunity to be heard at a meaningful time and in a meaningful manner. *Armstrong* v. *Manzo,* 380 U.S. 545, 552, 85 S. Ct. 1187, 14 L. Ed. 2d 62 (1965). It was apparent to the court from its previous hearings that the defendant's available assets had been depleted and that, unless measures were taken to prevent such occurrence, the defendant's resources would be further depleted. In the circumstances, preserving the status quo was an appropriate response.

There is error in part, the judgment is set aside and the case is remanded with direction to render judgment as on file except as modified in accordance with this opinion with respect to counsel and expert fees.

In this opinion the other judges concurred.