[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON MOTIONS CODED 119, 128, 130, 131
The defendant has filed the following motions which are before the court: (1) motion for modification of alimony coded 119; (2) motion coded 128 for counsel fees; (3) motion for order coded 130 regarding life insurance; and (4) motion coded 131 for counsel fees.
Many of the facts that give rise to these motions are not in dispute.
The marriage between the parties was dissolved by memorandum of decision, dated February 9, 1983, following a limited CT Page 10078 contested trial. The parties were married on November 7, 1959. They had been married for twenty-three years as of the date of dissolution. They had separated approximately three years before the trial date. At the time of dissolution, there were two adult children, issue of the marriage, Michael Cashman and Richard Cashman. After a separation for approximately one or two months, the plaintiff returned to the household but resumed his relationship with a female friend shortly thereafter, the aftermath of which resulted in a physical altercation between the plaintiff and the defendant, and a final separation in February of 1980. The plaintiff's actions contributed more seriously to the breakdown of the marriage. The plaintiff was employed at the time of the dissolution trial by Lieber Company, an investment advisement company, with a net weekly income of $659.61. The plaintiff was ordered to pay to the defendant alimony commencing at $350 a week and then finally reducing to $200 per week commencing six months from the date of the sale or transfer of the family home, which alimony was to continue until the death or remarriage of the defendant. The defendant was given the election to purchase the plaintiff's interest in the marital residence located at 260 Old Farm Road, New Fairfield, Connecticut. In the event she did not elect to purchase his interest in the family home, then the property was to be sold with the net proceeds divided 75 percent to the defendant and 25 percent to the plaintiff. The family home was sold in July of 1983. The defendant received approximately $30,000 to $36,000 from the sale of the family home, and the plaintiff received approximately $10,000 to $12,000 from the sale of the family home.
The plaintiff was further to designate the defendant as beneficiary on his John Hancock policy in the amount of $25,000. Said designation was to continue for as long as the defendant is entitled to alimony. At the time of dissolution, in addition to his interest in the family home, the plaintiff owned clothing, furniture and fixtures with an undetermined value. He had a checking account with a balance of $900. He also had a pension fund, known as the Evergreen Fund, with a value of $17,500. The defendant was not granted any interest or rights to the plaintiff's pension fund. The plaintiff also had two life insurance policies, one in the face amount of $10,000, and the second in the face amount of $25,000, neither of which had any cash surrender. He had liabilities totalling $10,038, with weekly payments on the liabilities of $148.62. He had basic weekly expenses of $973.66. CT Page 10079
As of the date of dissolution, the defendant was employed doing odd jobs earning about $35 per week. She owned an automobile with a value of $600 and no loan balance. The family home had furnishings with a minimum value. All of the furnishings and personal possessions at the family home with a minimal value were awarded to the defendant. She had $14 in a savings account. She had liabilities totalling $6416.50. Included in those liabilities was $4500 due for attorney's fees. The plaintiff was ordered to pay, on behalf of the defendant, the sum of $2500 as counsel fees. That would then have reduced her counsel fees to $2000 and the total liabilities to $3916.50. She had basic weekly expenses of $432.67, which included payments on the first and second mortgage on the family home.
After the dissolution of marriage between the parties, the defendant obtained employment in Greenwich working for Penn Central. Her starting salary was approximately $21,000 annually. She remained there for approximately three and one-half years until the corporate headquarters moved to Ohio.
The defendant elected not to go to Ohio when the move was made by her employer. She was earning approximately $25,000 to $26,000 when she terminated her employment. She received a severance pay of three and one-half months of her salary. Her employment terminated on December 31, 1987.
When her employment at Penn Central terminated, the defendant had an individual retirement account with a balance of between $12,000 to $14,000.
After terminating her employment with Penn Central, the defendant moved to Florida where she remained for approximately seven months between January and July of 1988.
While in Florida, the defendant was working earning between $7 or $8 hourly.
During the time the defendant resided in Florida, between January and July of 1988, she had her own apartment. She went to Florida to start her own business. The $20,000 that she invested in that business was lost.
After leaving Florida in July of 1988, the defendant returned to Connecticut where she obtained employment with IBM in December, 1988, initially as a temporary secretary earning $8 CT Page 10080 hourly. She was promoted to a full-time position after three months at a starting salary of $18,000 annually commencing April, 1989.
When the defendant left IBM in approximately October, 1991, she had accumulated a few thousand dollars in an IRA which she withdrew when she left. She had been earning between $21,000 to $22,000 when she left IBM. The reason that she left was because her job was being eliminated. She received a severance package from IBM.
After leaving IBM, she obtained employment with the RSA Corporation in New York with a starting salary of approximately $27,000. That employment required that she make a round trip of approximately 100 miles daily between her condominium and her job. She remained with RSA from approximately October, 1991 to June of 1993. When she took employment with RSA, she was led to believe that they would be moving their corporate office to Connecticut. That move did not take place.
When she left her employment with RSA, she was earning approximately $27,500 annually.
She next obtained employment with Mercedes-Benz in June of 1993 at their Norwalk, Connecticut, office as a senior secretary. While working at Mercedes-Benz, she also had part-time employment with Macy's as well as with Lord Taylor. She remained with Mercedes-Benz for approximately seven months to approximately February of 1994. She was terminated from that employment as a more senior secretary took over her position. After being terminated from Mercedes-Benz, she drew unemployment compensation of $200 weekly. She also received a severance package from Mercedes-Benz.
Her severance package consisted of being paid the equivalent of three and a half to four and a half months pay. Her unemployment compensation benefits commenced one month after she was terminated from Mercedes-Benz. Her unemployment compensation was from the State of New York and was approximately $260 weekly. She was out of work from February, 1994 to approximately October, 1994. She did not claim unemployment compensation benefits for the two to three week period that she was in Florida and Texas. She was earning approximately $28,000 at Mercedes-Benz when her employment was terminated. CT Page 10081
She applied for employment with the State of Connecticut in February of 1994. She took a state test in May of 1994 which she passed in August of 1994 for state employment. She was hired in October of 1994 at Western Connecticut State where she now works. She applied for a position at Western Connecticut in August of 1994. Between the time she left IBM and the time she was hired by the State of Connecticut, she did some part-time temporary jobs. Her starting salary at Western Connecticut was $23,000. She has received wage increases. The maximum salary that she can earn, in her present position, is approximately $30,000. Her retirement plan at Western Connecticut will be vested when she is age sixty-six, after ten years of employment. She will then receive $320 monthly at age sixty-six. She can obtain social security at age sixty-two of $525 monthly.
After the family home was sold, the defendant rented a condominium in Brookfield, Connecticut. She purchased that condominium in July of 1984 for $75,000. It was financed in part by a $50,000 first mortgage, payable over thirty years, at a variable interest rate.
At the time of dissolution, the defendant had a high school diploma and had taken some legal secretarial courses.
The defendant will be eligible at age sixty-five to receive one-half of the amount of social security being received by the plaintiff or to receive $525 monthly based on her own social security earnings.
The defendant is in excellent health. She does have some dental problems.
The defendant recently took a trip to Israel that was paid for by her son and daughter-in-law.
The monthly mortgage payment on her condominium is $509 which includes real estate taxes. Common charges are additional and are presently in the amount of $161 monthly. The defendant's financial affidavit, dated October 17, 1996, shows that there is withheld for federal taxes from her gross weekly income $86.60 weekly. Based on the evidence presented, the court reduces that amount to $66 weekly. The defendant's present gross weekly income is $518.91 as a secretary, and her net weekly income is $382.88. One of her basic weekly expenses is for special condominium assessment of a total of $1260. That assessment is payable at the CT Page 10082 rate of $210 monthly, commencing September of 1996, for a total of six months. She was unable to make the September, 1996, monthly assessment payment of $210 and received that money from her son Richard. Commencing approximately 1993 or 1994, her son Richard would provide some occasional financial help to her. Her son Richard has given her between $30,000 to $40,000 to help her meet her expenses. He paid off a home equity loan that she had of approximately $20,000. She had used that money to unsuccessfully start a business in Florida. Her son also gave her $2000 that she used to air condition her condominium and for a new dishwasher. The defendant presently drives a 1996 Ford that she leases. That lease terminates in February of 1997. The vehicle that she owned at the time of the divorce was sold. She then purchased an Oldsmobile using part of the proceeds from the sale of the family home. When she had transmission problems on the Oldsmobile, she traded it in towards a Toyota vehicle. She operated the Toyota from 1988 to December of 1994. She had monthly payments on the purchase of the Toyota of $325. That vehicle was damaged in an automobile accident. She received $3700 from the insurance company. She used that money to lease the present vehicle that she operates. The lease on the vehicle she is now driving terminates in February of 1997. Plaintiff's financial affidavit, under basic weekly expenses, shows travel and entertainment of $150 monthly. She travels once a year to Florida to see her grandchildren. She also travels to Texas to see her son who lives in Texas. That son pays for all of her expenses for the Texas trip. The defendant has current liabilities totalling $17,407.51. Included in those liabilities are attorney's fees incurred in the appeal in this case amounting to $4844.15, together with attorney's fees regarding the motion for modification totalling $6714.42. By the time the hearing on the motion to modify had ended, the total legal fee for the defendant was $9814.42. The parties have stipulated that both the $4844.15 legal fee and the $9814.42 legal fee are reasonable. The parties are in dispute as to whether the plaintiff should pay any or all of those legal fees. As a result of the increase in her legal fees, her total liabilities now amounts to $20,507.51. One of her current liabilities is her VISA in the amount of $4118.04. That is as a result of her trips to Florida and dental work as well as using VISA for gasoline for her vehicle. She has also used VISA for department store charges and restaurant charges.
The defendant has an IRA with a balance of $11,232. That IRA is a rollover from what she had when employed at Penn Central. CT Page 10083
In 1992, the defendant had gross income of $27,543. In 1993, she had gross income of $28,721. In 1994, she had gross income of $15,447 plus unemployment compensation of $8028 for a total of $23,475. In 1995, she had gross income of $23,732.
The value of her IRA in 1994 was approximately $21,600. It is now $11,232. The reduction is as a result of investment losses. Her son in Texas advises her regarding investments and has agreed to cover her investment losses.
The defendant's financial affidavit includes, under basic weekly expenses, $100 monthly for dental expenses. She is presently not paying that $100 monthly. Her financial affidavit also shows a monthly expense for electricity of $90. The court finds that amount is $58 monthly.
The present value of the defendant's condominium at 20 Monika Lane, Brookfield, Connecticut, is $120,000. She has a mortgage with a balance of $42,000. In 1988, she took out a home equity loan and used the $20,000 from that loan to invest the failed Florida business. The home equity loan was paid off in full by 1995.
The plaintiff has approximately eighty-six college credits. In June of 1994, First Union Bank took over Lieber Company. He is still employed by Lieber Company at the present time. His present annual salary is $307,500. He has held the position of senior equity trader for approximately fifteen years. Lieber Company is now a division of First Union Bank.
The plaintiff married his present wife in October of 1983. In March or April of 1995, he transferred to his present wife $410,000 from a joint savings account. That was done after the present motion to modify was served. Approximately $300,000 of that $410,000 came from his own earnings.
His present wife has not worked since approximately 1990. In 1990, she was earning approximately $45,000. In entering the orders hereinafter entered, the court has not considered her earning capacity. Further, the court has not considered the interest that the plaintiff could be earning on the $410,000 that he transferred to his present wife. His present wife has not contributed to any of his present retirement funds or bank accounts. The home that he owns at 9 Overlook Road, Purdy, New York, is presently for sale. CT Page 10084
The plaintiff is fifty-nine years old. He does not have an employment contract with First Union. He was diagnosed with colon cancer in 1990. He has a complete physical checkup every six months and blood work every three months. He also has gall bladder problems. He had surgery for a bleeding ulcer during his marriage to the defendant. Although he has been advised to stop smoking, he has not done so.
The plaintiff has a retirement plan with Lieber Company. He contributes $9000 annually to 401K plan and that same amount is contributed by his employer. When First Union took over Lieber in 1994, he had approximately $700,000 to $750,000 in a profit-sharing plan. He transferred that to a Fidelity account. His present retirement funds consist of an IRA Fidelity with a total value of $235,000; an IRA Fidelity with a total value of $600,000; a 401K plan with First Union with a total value of $60,000; and a pension plan with First Union with a total value of $27,000. His financial affidavit submitted at the commencement of the hearing on the motion to modify, dated October 17, 1996, showed that his present wife had a 50 percent interest in his retirement funds. When requested by the court to submit trial briefs as to the basis for the claim, as shown on his financial affidavit, that under New York law his present wife was entitled to 50 percent of those retirement funds as marital property, he revised his financial affidavit and eliminated that claim. Therefore, his total retirement funds amount to $922,000. He has had his 401K plan with First Union since 1994. He will be entitled to social security benefits when he retires at age sixty-five of approximately $12,500 annually. He presently owns a home that was very recently constructed, shown on his financial affidavit as a "new home," with an approximate fair market value of $650,000 and a mortgage of $440,000. That home is in joint names with his present wife. His 50 percent equity in that home is $105,000. He also owns a home that he presently lives in at 9 Overlook Road, Purdy, New York, with an approximate fair market value of $280,000, a first mortgage of $65,000, and a second mortgage of $128,000, with a total equity of $87,000. That home is owned jointly with his present wife and his 50 percent interest amounts to $43,500. He owns a 1996 Nissan with a fair market value of $38,000 and a loan of $30,000 with $8000 equity. That vehicle is owned jointly with his wife and his one-half interest amounts to $4000. He has a checking account at Nat West jointly with his wife with each owning a 50 percent interest. The balance in that account is $4234.84 cents. His one-half interest CT Page 10085 amounts to $2117.42. He has a tax free Fidelity Spartan account jointly with his wife with a total balance of $50,150.57. That is a savings account. It is interest free for federal and state tax purposes. His one-half interest amounts to $25,075.29. He jointly owns with his wife an account at Nat West money market with a total value of $5602.53 with his half interest being $2801.27. He also jointly owns with his wife a Sequoia fund which is a mutual fund with a total value of $1100 and his one-half interest being $550. The total value of his equity in his real estate and bank accounts is $183,043.98. The total value of his retirement fund is $922,000. He has household furnishings in which he says the value is unknown. His total liabilities regarding a swimming pool, landscape work, outside shed, two VISA accounts and Filene's amounts to $54,400 for which his wife is one-half liable and his one-half amounts to $27,200.
The plaintiff's financial affidavit shows a monthly deduction of $791.60 for his 401K plan. No such deduction is presently being made as he has already contributed the maximum of $9000 to that plan. Therefore, his net monthly income is increased from the $15,082.65 shown on his financial affidavit by $791.67 to a total of net monthly income of $15,874.32. The plaintiff has current monthly expenses of $19,353.33. He recently purchased a new watch for his wife for $10,500. The plaintiff and his wife annually take a trip to Bermuda at a cost of approximately $5000. The total amount that he is presently spending annually on vacations is approximately $10,000. Although his financial affidavit shows that the household furnishings has an unknown value, he spent an excess of $5000 for new home furnishings in April of 1986. He has paid $30,000 in legal fees to date regarding the motion to modify.
The present motion to modify was served on the plaintiff on May 23, 1994.
The parties are in dispute as to whether, in the event the court enters an order modifying the present alimony order, that order should be retroactive to the date of service of the motion on the plaintiff. The court finds the additional following facts regarding this issue. The defendant's motion to modify, dated March 10, 1994, included an order to show cause that was granted by the court on May 9, 1994, ordering the plaintiff to appear before the Superior Court in Danbury on June 13, 1994, to show cause why the foregoing motion for modification should not be granted. A summons was also ordered by the court, ordering the CT Page 10086 plaintiff to appear before the Superior Court in Danbury on June 13, 1994, to answer to the motion for modification of the defendant, Concetta Cashman, by leaving a true and attested copy of said motion for modification, order to show cause, and order of the court thereon and of the summons. The summons was directed to "to any proper officer, sheriff or process server authorized to serve process in the State of New York or to any indifferent person." Denis Illuminate is a process server in the State of New York. He has been serving process in New York for eleven years, an average of six to eight times daily six days a week. In the last eleven years, his service of process has only been challenged three times. On May 18, 1994, he personally served the plaintiff with a copy of the order to show cause. Further, on May 23, 1994, he personally served the plaintiff with a copy of the summons and motion for modification. Denis Illuminate is over eighteen years of age. Under New York Civil Procedural Law Rules § 2103(a) papers may be served by any person not a party of the age of eighteen years old. Denis Illuminate is not a party to the present action. The defendant's motion for modification, coded 119, did not include a claim for a retroactive order to the date of service of the motion. Connecticut P.A. 90-188 amended § 46b-86 (a) by providing:
 No order for periodic payment of permanent or support may be subject to retroactive modification, except that the court may order modification with respect to any period during which there is a pending motion for modification of an alimony or support order from the date of service of notice of such pending motion upon the opposing party pursuant to section 52-50.
Section 52-50 (a) provides that "[a]ll process shall be directed to a sheriff, his deputy, a constable or other proper officer authorized by statute, or, subject to the provisions of subsection (b) of this section, to an indifferent person. A direction on the process `to any proper officer' shall be sufficient to direct the process to a sheriff, deputy sheriff, constable or other proper officer."
All parties are in agreement that in the event the court were to grant the motion to modify, retroactive to the date of service, that it should be based on current financial circumstances and not on the financial circumstances that may have existed on the date the motion to modify was served on the CT Page 10087 plaintiff. The court is basing its orders on the current financial circumstances of the parties. The plaintiff claims that for the following reasons that any modification entered by the court should not be retroactive to the date of service of the motion to modify on the plaintiff: (1) abode service was made in this case; (2) there is no evidence that service was made by a proper officer; (3) there is no claim of retroactivity in the motion to modify; (4) the motion to modify was not pending during the appeal period; and (5) the defendant is the party who took the appeal.
These claims will be discussed seriatim:
1. The plaintiff's claim that abode service was made in this case. The court finds that personal service was made upon the plaintiff on the motion to modify and therefore rejects that claim.
2. The plaintiff's claim that service was not made by a proper officer.
The plaintiff claims that the requirement of process to be served under § 52-50 by "other proper officer authorized by statute" refers to Connecticut law and not New York law. The court is not persuaded by that claim. In Cato v. Cato, 226 Conn. 1
(1993) the issue was whether an order of notice is necessary to meet the jurisdictional requirements of Connecticut General Statutes § 46b-46, the domestic relations long-arm statute. In that case, the defendant, who resided in Texas, received in-hand service of process by a process server in Texas. It was the fact that the in-hand service was made by a process server authorized to serve process in Texas that formed the basis of finding that there was jurisdiction to proceed to hear the underlying dissolution of marriage.
3. The plaintiff's claim that retroactivity was not claimed in the motion for modification. The plaintiff is correct in claiming that the motion for modification did not include a request for a retroactive order. The plaintiff claims that under due process the failure to include that in the motion deprives the defendant of the right to request that any modification be retroactive to the date of service. The court is not persuaded by that argument. The court finds the following additional facts. After the defendant had the plaintiff served by a proper officer in New York with a copy of the motion to modify, and claimed the CT Page 10088 matter for hearing, the plaintiff moved to dismiss on the grounds that he was a New York resident, and therefore the court did not have jurisdiction over him. The trial court granted the plaintiff's motion to dismiss, and the defendant appealed. The Appellate Court reversed the ruling and found that there was jurisdiction to hear the defendant's motion for modification. In many respects, this case is similar to Bartlett v. Bartlett,220 Conn. 372 (1991). In Bartlett, following a dissolution of marriage, the plaintiff wife moved to modify the judgment to increase the award of periodic alimony. The trial court denied the plaintiff's motion to modify concluding it should not consider an inheritance of the defendant in determining whether to modify and excluded evidence of that inheritance. The Supreme Court found that the exclusion of the evidence was error and remanded the case for rehearing. In Bartlett, the plaintiff's motion to reopen and modify the judgment to increase alimony did not include a claim for a retroactive order retroactive to the date of service of the motion upon the defendant. In Bartlett, an order for notice and hearing was entered by the assistant clerk of the court ordering that a copy of the motion and of the order for notice of hearing be served upon the defendant by some proper officer on or before October 3, 1990. The return of service of the sheriff shows that on October 2, 1990, abode service was made upon the defendant. In remanding the case for rehearing, the Supreme Court in Bartlett at page 384 stated, in part, as follows:
 We note finally that the plaintiff should not be penalized by the passage of time from the date she filed the motion to modify alimony to the date on which the new hearing will be held. If, on rehearing, the trial court should decide that she is entitled to an increase in her award of periodic alimony, the court's order should be effective as of the date of service of notice of the motion upon the defendant so as to afford the plaintiff the benefit of the modification from the time it was originally sought. General Statutes 46b-86 (a).
The Bartlett court ordered retroactivity on remand although there was no claim for retroactivity in the motion to modify. This court reads Bartlett to hold that it is not necessary for a claim for retroactivity to be included in the motion to modify in order for the court in its discretion to enter an order retroactive to the date the motion to modify is properly served CT Page 10089 upon the opposing party.
4. The plaintiff's claim that the motion to modify was not pending during the appeal. Section 46b-86 permits the court to enter a retroactive modification order "with respect to any period during which there is a pending motion for modification of an alimony or support order from the date of service of notice of such pending motion upon the opposing party pursuant to section 52-50." The plaintiff argues that during the time the case was under appeal to the Appellate Court, that the motion to modify was not "pending" and therefore there cannot be a retroactive order. The court is not persuaded by that argument. The motion to modify was pending during the time the appeal was taken but was held in abeyance until the appeal was decided. Pending is defined in Merriam Webster's Collegiate Dictionary, Tenth Edition, as "not yet decided." The defendant's motion to modify was not yet decided during the time the appeal was pending.
5. The plaintiff's argument that the defendant is the party that took the appeal. The court does not find that there is any merit to that argument. Just as in Bartlett, the party who took the appeal was found to be entitled to a retroactive order, so too in this case, the fact that the defendant took the appeal is not grounds to prohibit her from receiving a retroactive order.
The court in its discretion finds that it is appropriate that the modification order hereinafter entered be retroactive to the date of service upon the plaintiff, namely, May 23, 1994.
The court finds that there has been a substantial change in circumstances from the date of dissolution to the present time as a result of an increase in the plaintiff's net weekly income from $659.61 to a net monthly income of $15,874.32. The court further finds that there has been a substantial change in circumstances as a result of the plaintiff's increase in assets. At the time of dissolution, the plaintiff's assets consisted of an equity in the family home of between $10,000 to $12,000, together with a checking account of $900, together with a pension fund of $17,500. He now has an equity in real estate and miscellaneous bank accounts of $183,043.98 plus retirement funds totalling $922,000. His liabilities at the time of dissolution totalled $10,038. His one-half interest in his present liabilities amounts to $27,200.
The defendant also seeks an order, under the motion coded CT Page 10090 130, to increase the amount of life insurance from the amount ordered at the time of dissolution. The authority for the court to enter such an order is found in Turgeon v. Turgeon, 190 Conn. 269,284, 460 A.2d 1260 (1983).
In Turgeon, there was a post judgment contempt finding against the defendant for failure to pay alimony, counsel fees and expert witness fees. After the contempt finding that was entered on April 14, 1992 for failure to pay alimony, counsel fees and expert fees, the trial court, in June of 1982, entered an order that there be no further transfer of machinery, principal assets or any further encumbrance of assets of New England Precision Products until further order of the court. TheTurgeon court on page 284 held, in part, as follows:
 The equitable authority of the Superior Court to render such orders as may be required to protect the integrity of its judgments in dissolution matters is clear . . . It was apparent to the court from its previous hearings that the defendant's available assets had been depleted and that, unless measures were taken to prevent such occurrence, the defendant's resources would be further depleted. In the circumstances, preserving the status quo was an appropriate response.
This court reads Turgeon as holding that where there has been some action on the part of the payor indicating a threat to the integrity of the court's judgment, the court can enter such orders as may be required to protect the integrity of the original judgment.
The plaintiff has kept current in all of the financial orders that he was required to comply with. There is no threat to the integrity of the original judgment of the court.
This court has considered the provisions of § 46b-82 in determining the issue of modification of the alimony order. This court has also considered the provision of §§ 46b-62 and46b-82 in determining the issue of attorney's fees. The court enters the following orders.
ORDERS
1. Alimony is increased from $200 weekly to $1,050 weekly CT Page 10091 retroactive to May 23, 1994. The arrearage created by this order is to be paid in full by December 30, 1996. Interest on the unpaid amount is to be paid at the rate of 10 percent per annum commencing December 31, 1996.
2. No attorney's fees are awarded in favor of either party.
3. The defendant's request to have the plaintiff provide additional life insurance is denied.
Axelrod, J.