[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This matter comes before the court by writ returnable on April 29, 1997. By way of claims for relief, both parties seek a dissolution of the marriage. The plaintiff seeks, by way of relief, that the defendant be ordered to maintain health insurance for the plaintiff on the same terms and conditions that it is available to him, and, that each party be declared the sole owner of all assets currently in their respective control or possession. The defendant's claims for relief seek an order for CT Page 10358 the plaintiff to pay the defendant, as a property division, the sum of $500,000.00; thereafter, that each party may be the sole owner of their respective assets free of any claim from the other. The defendant also offers to cooperate in the plaintiff's assertion of her right to continued coverage on defendant's work-related health insurance, with cost to be paid by the plaintiff.
These parties intermarried on May 30, 1970. One party has resided in the State of Connecticut continuously prior to the bringing of this action. The parties have had two children of the marriage, Brian and Brendan. Neither are minors. No minor children have been born to the wife since the date of this marriage. The marriage between the parties has broken down irretrievably, with no reasonable hope of its reconciliation. Mrs. Dahill is 60 years old. Mr. Dahill is 66 years old. The parties have been married 28 years.
At the time of the parties marriage, each had been married once, previously.
Mrs. Royce Dahill came to the marriage with five minor children. She received child support of $250/month for the five children. Mr. James Dahill came to the marriage with two minor children. He paid $150/month child support for them. They were in his home largely on a weekend/holiday visitation schedule, although one son stayed with them for periods of time.
Mrs. Dahill, who is 60 years old, has never worked outside the home in her adult life. She has always been a homemaker. Her mother, who died in 1996, was a wealthy woman who provided support in a variety of ways. Mrs. Dahill is an alcoholic. Commencing with two detoxification stays at Elmhurst, in 1971, her alcoholism raged on a periodic basis throughout the marriage. For the past 12 1/2 years since 1985, however, she has not had any alcohol to drink. She has other serious health problems, as well. In the year, 1997, she was hospitalized on two occasions for respiratory problems, for over a month.
During the marriage, Mrs. Dahill would receive monthly income from trusts associated with her grandmother and mother. Early on, it was approximately $950 per month. At the time of the marriage and throughout the time they lived together, the parties lived at a home at 120 Buell Street, North Haven. This property was owned by Mrs. Dahill's mother. There was a mortgage on it which was paid by the mother. In 1983, the property was transferred to Mrs. CT Page 10359 Dahill by her mother. Thereafter she paid the taxes and insurance. Mr. Dahill, throughout the marriage, paid no expenses of the home, except the utilities.
Mr. Dahill has been, throughout the marriage, employed by a family business, the F.J. Dahill Company, Inc. The company was founded in 1883. It has remained continuously in the family since its inception. Just prior to the time of the parties' marriage in April, 1970, Mr. Dahill was paid $250/per week by the company. He also had a 28% stock ownership of F.J. Dahill, which share was worth about $39,200.00 at the time of marriage.
The real estate on which the company's facilities are located, is owned by a real estate holding company, Dahill Enterprises, Inc. Shortly before the marriage, in the financial affidavit for the dissolution of his first marriage, Mr. Dahill disclosed no ownership of any portion of that business.
At this time Mr. Dahill owns 1/2 of the shares of stock in F.J. Dahill and 1/3 of the shares of stock in Dahill Enterprises. On his financial affidavit he values his interest in the F.J. Dahill stock at $350,000 and in the Dahill Enterprises at $100,000.
Mr. Dahill has also had poor health in 1997. In November, he had a massive heart operation from which he is currently recuperating. Since January 15, 1998 (and until April 15, 1998), he has been living in Long Boat Key, Sarasota, Florida and attending rehabilitation three times per week at the hospital there. In November, 1997, in anticipation of the surgery, Mr. Dahill executed a shareholder agreement with Mr. McAdam (the other shareholder) which made provisions for purchase of shares on the shareholder's death, retirement or disability. The formula for buyout of the shares, on the occurrence of one of these events, is one and one-half times book value. By the terms of the Shareholders' Agreement between the company, McAdam and Dahill, the defendant may first offer his shares to his son James Dahill. If he chooses not to do so, or they are not purchased, McAdam and then the corporation, sequentially have the right to purchase the stock. If the shares are being sold as a result of death or disability, the company must buy the shares (paragraph 4.2 of the agreement). Otherwise, if the stock sale is a result of termination, Dahill may sell the stock to any third party, without restriction. If the company buys the stock it may pay for the stock over a 7 year period with interest benchmarked to the CT Page 10360 prime rate (Shawmut). The entire payment could defer for ten years if the company's Board of Directors determines it necessary as defined in the Agreement.
Much of the trial was spent over the issue of the valuation of this agreement and the shares of stock in the company owned by Mr. Dahill. Mr. Dahill is invested emotionally, psychologically and economically in the future of the company as a Dahill family-owned business. He has every intention to remain active with the company as long as he is physically able. He has no present intention of selling his shares of stock in his lifetime. The company carries a $1.3 million life insurance policy on Mr. Dahill for the purpose of funding the purchase of his shares, on his death, from his estate.
Mr. Mark Harrison testified as an expert for the plaintiff regarding tie valuation of the defendant's Dahill shares under the Shareholder Agreement. Mr. Harrison holds the dual credentials of Certified Public Accountant and an attorney. He has testified before this court previously; he is a well-established expert in the area of valuation of business interests. Mr. Harrison valued Mr. Dahill's share at $1,100,000, or one and one-half book value. The valuation is pursuant to the mechanism established in the Shareholder Agreement. He conceded that, to date no triggering event had occurred such that Mr. Dahill's shares were being marketed under the Shareholder's Agreement. He conceded that the value of $1.1 million is not the fair market value of the shares. Instead he defined it as the value to Mr. Dahill at this time (or, "the in hand value").
"In assessing the value of . . . property . . . the trier arrives at h[er] own conclusions by weighing the opinions of the appraisers, the claims of the parties, and h[er] own general knowledge of the elements going to establish value, and then employs the most appropriate method of determining valuation. (Citations omitted.)" Turgeon v. Turgeon, 190 Conn. 269, 274,460 A.2d 1260 (1983). The court has been presented with the expert testimony of Mr. Harrison, valuing the Dahill stock based upon the shareholder agreement. None of the triggering events in the shareholder agreement have occurred and therefore the computation based upon present book value cannot be said to apply to some future, indeterminate date. The orders of this court must be based upon he valuation of the assets on the date of the dissolution of the marriage. Connecticut General Statutes section46b-81 (a); Sunbury v. Sunbury, 216 Conn. 673, 676, 583 A.2d 636
CT Page 10361 (1990). The court does not accept the valuation of the stock offered by Mr. Harrison. Had a triggering event occurred it might well be an appropriate value to assign to the stock. What the future holds for the health of the Dahill business is not determinable at this time. It is not permissible for the court to base today's valuation on the uncertainties attendant thereto. Further, the court rejects to notion that this is an acceptable method of valuation of the fair market value of Mr. Dahill's stock interest. It is, he court's duty to find the fair market value, not the book value, or the `in hand value' to Mr. Dahill.Ibid, p. 274, 275.
Mr. Dahill valued his stock at $350.000. This was based on a reported value to him over five years ago from the firm accountant. He had no independent basis for assigning a value to the stock. It is axiomatic that an owner of property is qualified to testify as to the owner's opinion as to its value. Cross-examination, however, revealed that Mr. Dahill's value is based upon an opinion given to him by the company's accountant in 1992. The accountant was not presented for examination. Mr. Dahill had no independent opinion as to value; he had no evidence to offer as to the basis of the valuation of $350,000 listed on his financial affidavit. Further, the reference to the value having been established as of 1992 makes its point of reference so distant in time that it cannot be found relevant to a valuation in 1998.
By memorandum dated March 30, 1998 (some of the findings in which this court has incorporated into this decision for ease of reading) this court determined that it was necessary to reopen the evidence for the purpose of additional evidence regarding the value of Mr. Dahill's stock in F.J. Dahill Company. Pursuant to Practice Book section 25-33 (P.B. 1998) Mr. Kenneth Pia was appointed to independently determine the fair market value of that stock ownership. Mr. Pia, an accountant, accepted the appointment and performed an evaluation of that stock ownership and prepared a report regarding the same. Mr. Pia valued Mr. Dahill's stock ownership as of June 30, 1998 Mr. Pia determined that the stock had a fair market value of $490,000.00. Mr. Pia testified that his total fees for this work were $9,000.00 plus additional time as follows: three hours at deposition noticed by the defendant and one and one-half hours in court. His billing rate is $160.00 per hour. He has been paid $5,000 to date by the parties, shared equally between them. The court finds that total CT Page 10362 fees due Mr. Pia are $4,720.00.
A hearing was held in which Mr. Pia testified and the parties' counsel had an opportunity to cross-examine him. Mr. Pia, in preparation of his report and promulgating the fair market value of the stock had all information before him that he sought except that he did not have a copy of the 1992 valuation prepared by an accountant. (There were differing accounts as to the reason for this, and this court declines to make a finding that there was any intent to deprive him of the report.)
Mr. Pia utilized a capitalization of forecasted debt-free net cash flow method. The reason for this is that he determined that the earnings of the company were a primary factor to consider in the context of the company being an active, fully operational business. Much of the examination of Mr. Pia centered on whether the lack of marketability discount applied was appropriate. The discount applied for illiquidity is 24%. Mr. Dahill's position is the discount applied was far too low, based upon writings of leading experts in the field. Mrs. Dahill's position is that the discount is far too high because the shareholder agreement functions as a "put" right which would therefore reduce or eliminate the lack of marketability discount. It is unclear to the court whether the shareholder agreement could be enforced, given the small margin for profit the company operates at, and the competing interest of the other shareholder James McAdam in the agreement. Based upon the evidence before the court there is no reason to reject this as an appropriate discount applied to in an earnings before interest and taxes method of valuation.
Mr. Pia further testified that the valuation calculation is based upon forecasts for 1998 provided by management. The forecasts relied upon by Mr. Pia for 1998 have been exceeded, in actuality, in the first six months of this year. The forecasts predicted a loss in the first six months of $496,000 from operations. In actuality, the loss for the first six months was $129,000, 74% less than was predicted. Mr. Pia did not revise his valuation based upon the actual operations' first six months. The court notes that the profit margin for the F. J. Dahill Co., Inc. is only one (1%) per cent.
Based upon all of the evidence before the court, and a consideration of the different methods and approaches to valuation, this court must determine, to the extent possible the fair market value of Mr. Dahill's stock ownership in the company. CT Page 10363 The court finds that Mr. Dahill's ownership interest in fifty per cent of the stock of the F. J. Dahill Company, Inc. has a present fair market value of approximately $500,000.00. Mr. Dahill may realize substantially more upon the sale of this stock if a triggering event occurs and the stock is sold under the terms of the shareholder agreement.
Throughout the marriage, the parties kept their holdings separate. Mr. Dahill, in 1989, purchased a condominium unit at Castle Rock in Branford in his sole name. Bank accounts were kept separate. Mr. Dahill occasionally purchased gifts for Mrs. Dahill. In 1991 he won a BMW automobile which he gifted to Mrs. Dahill. She still drives it today.
The parties have had more than one separation. The longest previous separation was for approximately one year in 1989. At that time, Mr. Dahill moved into his Branford condominium. He returned home.
In 1994, Mr. Dahill left the marital home and has not returned. The leaving was precipitated by an emotional discussion surrounding a drug problem of their son, Brian. Mr. Dahill has, since 1994 lived at his Castle Rock condominium unit. In June, 1996 he took an extended trip to Paris, France with a woman companion, Tricia Hadden. She has been his companion since that time.
In July, 1996, Mrs. Dahill's mother Alice Usher, died. Upon the occasion of her death, Mr. Dahill terminated all voluntary support to his wife. From separation in 1994 through June, 1996, Mr. Dahill had provided voluntary support to Mrs. Dahill. Initially he provided $1,500 month. When one child left the home he scaled it back to $1,000 per month.
As a result of the death of Alice Usher in July, 1996, a substantial inheritance has come to Mrs. Dahill. It exists in several components. Mrs. Dahill is the recipient of certain trust income, which she discloses on her financial affidavit as providing about $20,000.00 per month in income. This is consistent with the estimate of her investment advisor, Robert L. Joynt that her annual income including dividends, interest and oil revenues is projected to be $230,000-$240,000 per year. The oil revenues are from oil wells currently held in trust; the plaintiff will shortly be deeded an undivided 25% interest in these oil wells, free of trust. CT Page 10364
Additionally, Mrs. Dahill received certain distribution of trust assets upon her mother's death. These were, in July 1996 valued at $1,600,000. Currently they are listed at a value of $2,200,000 on her financial affidavit. On her updated financial affidavit from the continued hearing in August, 1998, Mrs. Dahill has valued these trust assets at $2,380,000. Of the trusts from which the plaintiff receives income, in some instances she may be entitled to principal as well. She does not touch the principal and has no intention of doing so, leaving the money for children and grandchildren.
Mrs. Dahill inherited from her father an interest in Fairfield Corp which is currently valued at about $239,000, as invested by Paine Webber.
The defendant is concerned that his health is poor enough that he won't be able to continue working, and, he feels that he has insufficient reserves to be assured the he can adequately support himself upon retirement. He is skeptical of the receipt of sufficient funds from the sale of his interest in the F. J. Dahill Company to support his living needs. He is seeking by way of property settlement the sum of $500,000.00, the parties to otherwise retain their individual assets. The inherited wealth of Mrs. Dahill came to her two years after the parties separated. By then, Mr. Dahill had abandoned the marriage: he was intimately involved with another woman, with whom he remains involved. During his convalescence this past winter in Florida she remained by his side. Mr. Dahill has done nothing to contribute to or preserve these inherited monies. He was ready to engage in his separate economic life without the knowledge that they would be an asset for consideration or distribution.
The court has carefully considered the statutory criteria for both the award of alimony (Connecticut General Statutes section46b-82) and assignment of interest in the estates of the parties (Connecticut General Statutes section 46b-81(c)). The parties concede that the court has the authority to enter an order awarding alimony if it deems it appropriate, even in the absence of a request for the same.
Considering the length of the parties' marriage, their age, the recent health problems of Mr. Dahill, the estate of each of the parties and their amount and sources of income, this court finds it equitably appropriate to order alimony payable by Mrs. CT Page 10365 Dahill to Mr. Dahill.
The court orders:
1. Dissolution of the marriage.
2. The plaintiff shall pay to the defendant alimony in the amount of $1.00 per year. Said alimony shall terminate on the earliest of the following events: either parties' death of the remarriage of the defendant. The statutory provisions of Connecticut General Statutes section 46b-86(b) apply to the occasion of the defendant's cohabitation or living with another person.
3. The defendant is ordered to provide medical insurance for the benefit of the plaintiff so long as he may do so as an incident of his employment. The plaintiff shall reimburse the defendant for the cost or said insurance coverage (premium cost) no less frequently than quarterly. If such insurance cannot be provided by the defendant for the plantiff then he shall immediately notify her and cooperate in the acquisition and processing of the necessary paperwork for her extended (or COBRA) coverage. The plaintiff shall be solely responsible for the cost of that coverage.
4. Each party is the sole owner of all property, of whatever kind in their respective names, free and clear of any claim of the other.
5. Each party shall pay $2,360 (one-half of the sum of $4,720) to Mr. Pia within 21 days.
Munro, J.