[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an action for dissolution of marriage. On the return date the parties had been married 21 years. Both of their children have reached their majority.
This case presents the question, What are the consequences of a dissolution of this "marital partnership"[1] where the defendant, Mr. Chestone, is a very successful business executive and the plaintiff, Mrs. Chestone, has remained at home, taking care of the home and family, given the particular circumstances of this case and the statutorily-prescribed factors?
Both parties are in their mid-forties and in good health. Mr. Chestone has been the executive vice-president of an electrical contracting firm for three years; he has worked at the firm for over 20 years. His present gross weekly compensation is over $2,600, not including bonuses he has received annually for nine out of the past ten years; his weekly net is $1,769, according to Exhibit A.[2] Mrs. Chestone, on the other hand, has not worked outside the home and does not work at the present time. She has been and remains completely dependent on Mr. Chestone's earning capacity. Her only income at the present time is $1,000 per month in pendente lite alimony, while Mr. Chestone pays almost all of the bills for the former family home and other expenses for Mrs. Chestone.
Mrs. Chestone's employability is extremely limited. She is a high school graduate with virtually no work history. At trial she indicated that she intends to pursue additional education, with a view toward obtaining a position as a medical assistant, paying approximately $8.00 per hour. During the pendency of this action CT Page 3986 she has worked sporadically. Obviously, Mr. Chestone's employability is excellent. He has risen from an apprentice electrician to his present position during the marriage, and his earnings reflect that rise.
The parties stipulated that the former family home, in which Mrs. Chestone now lives alone, has a fair market value of approximately $380,000. Mrs. Chestone's sole assets are her share in the equity in that home, approximately $77,000, her share of the parties' household furnishings and other personal property. Mr. Chestone's financial affidavit at the time of trial showed very substantial assets, all of them acquired during the marriage. The balance of bank accounts shown was $123,000, his profit sharing plan (as of December 31, 1995) had a balance of $225,000, and he had an IRA worth over $31,000.
Excluding amounts owed to his attorney and on a boat purchased a few years ago, Mr. Chestone's liabilities totalled $8,000 at the time of trial; Mrs. Chestone's, $7,500.
The court has considered all of the criteria of Sections46b-62, 46b-81 and 46b-82 of the General Statutes, together with the applicable case law. Since "[i]t would serve no useful function to require the trial court ritualistically to rehearse the statutory criteria that it has taken into account", Scherr v.Scherr, 183 Conn. 366, 368 (1981), this court will not recount those statutory criteria and the evidence related to them, other than as stated subsequently in this memorandum. "The court is not obligated to make express findings on each of these statutory criteria." Weiman v. Weiman, 188 Conn. 232, 234 (1982). Suffice it to say that the court must consider all the statutory criteria in determining how to divide the parties' property in a dissolution proceeding, Leo v. Leo, 197 Conn. 1, 5 (1985), and need not give equal weight to each factor. Kane v. Parry,24 Conn. App. 307, 313-14 (1991).
To the outside world this marriage presented itself as a successful, working partnership for many years, in which Mr. Chestone progressed in his employment, while Mrs. Chestone supported his progress by taking care of their home and their children. Her testimony that she was the primary caretaker was never challenged by Mr. Chestone. In his words, Mrs. Chestone was the "one who was available for the children". Both parties benefitted [benefited] from this arrangement, as did their children. CT Page 3987
According to Mr. Chestone, however, this was an unhappy marriage, with very frequent conflicts between the parties. They argued over money and over Mrs. Chestone's conduct toward the children, which Mr. Chestone claimed was marked by frequent verbal and occasional physical abuse. Mrs. Chestone disputed that characterization, but the court found Mr. Chestone credible on that point. At the same time, Mrs. Chestone testified as to physical abuse by Mr. Chestone, consisting mainly of his pushing her during arguments, on one occasion pushing her to the floor. This occurred, she testified, three or four times a year for a significant period of the marriage. Neither party claimed, and the court does not find, that these incidents of abuse were the cause of the marriage breakdown.
Perhaps these difficulties explain why both parties were careless of their fidelity to the marriage. For five or six years, from about 1984 to 1990, Mrs. Chestone maintained a clandestine relationship with a man to whom she had been engaged prior to her marriage to Mr. Chestone. Beginning in the late 1980's and continuing into the 1990's, even to the present, Mr. Chestone established and maintained a close relationship with a woman in his workplace. Although he claimed that their relationship revolved around their respective duties at work, an exhibit consisting of her phone bills indicates that, after her employment ceased, and prior to the return date, they maintained very frequent and prolonged contact. Although Mrs. Chestone attempted to minimize her relationship, the court is satisfied it was intense and long-standing, and that she frequently involved the parties' children in it.
Whether or not these relationships were adulterous is not clear from the evidence, and the court will not make that finding. See Turgeon v. Turgeon, 190 Conn. 269, 278-79 (1983). There is no doubt, however, that both relationships distracted the parties from the efforts they should have made to restore their marriage, and contributed to its breakdown.
In such a situation, what should the parties' respective shares be in the assets accumulated during their "partnership"? A court's purpose in dividing marital property "is to unscramble the ownership of property, giving to each spouse what is equitably his". See, e.g., McPhee v. McPhee, 186 Conn. 167, 170
(1982). The court is bound by statute to consider "the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective CT Page 3988 estates". Section 46b-81 (c).
This is a case in which the decisions in O'Neill v. O'Neill,13 Conn. App. 300 (1988), and its progeny are relevant. O'Neill
held that "[a]n equitable division of property upon divorce or dissolution envisions that full recognition by the courts will be given to the noneconomic contributions of both spouses". Id., 311. Although Mr. Chestone was unwilling to acknowledge it at trial, Mrs. Chestone's consistent presence in the home and her care of their home and children advanced his career and contributed to their accumulation of assets during the marriage. This is not a case in which, while Mr. Chestone worked hard at his job, Mrs. Chestone had domestic help available to her so that she need not personally care for the home and children. Rather, it is a case in which O'Neill requires this court to "accord value to those nonmonetary contributions of one spouse which enable the other spouse to devote substantial effort to paid employment which, in turn, enables the family to acquire tangible marital assets. The investment of human capital in homemaking has worth and should be evaluated in a property division incident to a dissolution of marriage". Id.
O'Neill was an early recognition that "housework" is first of all, work. The spouse at home makes a substantial economic contribution to the family's assets as well as permitting the spouse working away from home to maximize his contributions. See K. Silbaugh, "Turning Labor Into Love: Housework and the Law," 91 Northwestern U.L.Rev. 1, 17-21, 57-58 (1996).
Mr. Chestone argued at trial that, although Mrs. Chestone is entitled to some share in the marital assets, that share should not be equal to his because her conduct during the marriage reflected "disloyalty" to him and to the marriage that should be reflected in the court's orders. As indicated above, however, Mr. Chestone also engaged in conduct which contributed to the breakdown of the marriage.
As usual, beyond the testimony concerning the parties' extramarital relationships, there was little reliable evidence as to other causes of the breakdown. The parties' son painted a picture in his deposition testimony of a breakdown attributable mainly to Mrs. Chestone. As is also usual in dissolution cases where the parties' children testify, there is substantial question as to the weight to be accorded his testimony. As indicated below, Mr. Chestone "gave" his son $90,000 at the end CT Page 3989 of 1995 when the marriage was breaking up. In addition, he has provided shelter for his son in the intervening months, found him a job at his own employer and given him substantial money toward an automobile lease. More important, Gary, Jr. harbors his own resentments toward his mother, arising out of her verbal and physical abuse of him and his sister. For these reasons the court did not give great weight to his testimony.
In the last analysis what is clear is that for 20 years Mrs. Chestone's contributions as primary caretaker of the parties' home and children were substantial, while there is no clear evidence that her contribution to the marriage breakdown exceeded that of Mr. Chestone. Accordingly, no reason appears why her work in the home over the 21 years of the parties' marriage should not gain for her an equal share in the assets of the marriage, all of which were accumulated during that period. The orders of the court will reflect that conclusion, a conclusion buttressed by the fact that Mrs. Chestone's "opportunity . . . for future acquisition of capital assets and income" is far less than Mr. Chestone's. Section 46b-81 (c).
The marriage of the parties had reached its nadir by December of 1995.[3] Both parties were openly considering a divorce. In that same month Mr. Chestone received a $90,000 bonus (net) for 1995. He transferred the entire sum through a circuitous financial route to the parties' son, something he had never done before with his yearly bonus.
At a hearing on pendente lite matters on May 8, 1996, Mr. Chestone testified as to his purpose in making that gift to his son. "My son was born with a serious heart condition. He has a congenital heart condition, has had six heart surgeries, and because I didn't know where this divorce was going and where the assets were going to end up, I wanted to make sure my son had some foundation for his future, and I transferred $90,000 — not transfer, I gave him $90,000 in his name, and they're in his name, his account number, his social security number." Transcript of proceedings of May 8, 1996, 12. However understandable Mr. Chestone's motives may be, his transfer of these funds to his son on the eve of this divorce proceeding was a transparent attempt to see that Mrs. Chestone received none of them, and, as such, was a fraudulent transfer. See Watson v. Watson, 221 Conn. 698,708-09 (1992). The total amount transferred must be included in the marital estate, and Mrs. Chestone is entitled to one-half of the net bonus. The court's orders will reflect that finding. CT Page 3990
Mr. Chestone received another bonus in the net amount of $42,000 at the end of 1996. He has disposed of all but $7,000 of that bonus, despite the existence of a restraining order that he not "dissipate, encumber or otherwise interfere, take actions to reduce the value of the assets, except to use for normal living expenses". Transcript of proceedings of March 18, 1996, 5. The court finds that the net amount of the bonus received by Mr. Chestone in December of 1996 constituted a marital asset. Based on his testimony as to the uses he made of the funds, the court is satisfied that $20,000 of those expenditures constituted "normal living expenses". of the remaining funds $15,000 was deposited on a $225,000 home in which Mr. Chestone plans to reside after this matter is resolved. The court finds this to have been an unnecessary and imprudent expenditure of funds and will include that sum with the remaining $7,000 in its property distribution orders.
With regard to the restraining order quoted above, Mrs. Chestone claims a violation of that order by Mr. Chestone during 1996 and a consequent dissipation of marital assets held in various accounts. Mr. Chestone's expenses during 1996 were unusually heavy, including the expenses of maintaining the former family home, which Mrs. Chestone refused to place on the market for sale. The court's analysis of those expenditures shows that his "normal living expenses" exceeded his net income by approximately the amount of the reduction in his bank accounts during the year. Therefore, no violation of the restraining order is found to have occurred.
Throughout the parties' marriage Mrs. Chestone has been completely dependent on Mr. Chestone for her financial support. Although she will receive substantial assets as the result of the dissolution, she continues to require income from Mr. Chestone until she can develop an independent earning capacity. Even then, her earning capacity will never come close to that of Mr. Chestone. It must be recognized that Mr. Chestone's ability to develop that superior earning capacity was partly the result of Mrs. Chestone's willingness to invest her time and effort in caring for their home and family. See K. Silbaugh, Northwestern U.L.Rev., supra, pp. 64-67. These facts create a continuing duty on the part of Mr. Chestone to meet Mrs. Chestone's need for support, the basis for an alimony award under § 46b-82. SeeWeiman v. Weiman, 188 Conn. 232, 234 (1982). His expenditures demonstrate that he fully intends to maintain the "station," CT Page 3991 i.e., the standard of living to which he has become accustomed. Therefore, there appears no reason why Mrs. Chestone should not do likewise to the degree the parties' resources permit. SeeBlake v. Blake, 207 Conn. 217, 232 (1988).
The court's orders will be structured in such a way as to encourage Mrs. Chestone to develop her independent earning capacity. Recognizing the real obstacles to employment posed by her age and her very limited work history, however, those orders will also provide for lifetime support. The court's intention is that one-half of Mr. Chestone's net income be paid to Mrs. Chestone for three years, 40% for an additional three years and33-1/3% thereafter. Exhibit A is the basis for the alimony orders entered herein.
The court finds that it has jurisdiction, that the allegations of the complaint are proven and are true, and that the marriage has broken down irretrievably. Based on those findings, as well as the court's consideration of the testimony and exhibits introduced at trial, its observation of the witnesses and assessment of their credibility, the court enters the following orders:
1. The marriage of the parties is hereby dissolved on grounds of irretrievable breakdown.
2. The former family home at 73 Harrison Drive in Wolcott shall be immediately placed on the market for sale with a licensed real estate broker agreed to by the parties and at an asking price also agreed to by the parties. The parties' agreement shall include provisions for periodic reductions in the asking price so as to encourage a prompt sale. Both parties shall do everything reasonably necessary to effect a prompt sale. The court retains jurisdiction to resolve any disputes between the parties concerning the sale of that property.
Upon the sale of the property, the parties shall share equally in the net proceeds after deduction of the real estate commission, closing costs and any other customary expenses of sale.
3. By way of further property distribution, within 45 days of the date of dissolution, the defendant shall transfer to the plaintiff the sum of $107,000, consisting of one-half of the balances shown in the bank accounts and certificates of deposit on the defendant's financial affidavit of January 28, 1997 CT Page 3992 ($61,000), one-half of the net bonus received by the defendant for 1995 ($45,000) and one-half of the balance of the net bonus received by the defendant for 1996 after his "normal living expenses" from that bonus are deducted ($11,000), the sum of the above having been reduced by $10,000 advanced by the defendant to the plaintiff for pendente lite support on May 8, 1996.[4]
4. By way of further property distribution one-half of the balance of the defendant's profit sharing plan and his IRA as of December 31, 1996 shall be transferred to the plaintiff by way of a Qualified Domestic Relations Order or other appropriate vehicle intended to minimize or eliminate tax liability for both parties. The court retains jurisdiction to approve any such Qualified Domestic Relations Order or other transfer vehicles. The plaintiff shall have no interest in the defendant's IBEW pension.
5. Until the sale of the former family home, the pendente lite financial orders shall remain in effect, i.e., the defendant shall pay to the plaintiff $1,000 a month as spousal support, and he shall pay the expenses previously ordered by the court. Thereafter, the defendant shall pay to the plaintiff by way of periodic alimony the sum of $885 a week for a period of three years from the date of dissolution plus half of the net bonus or other supplemental earnings he receives, excluding contributions to his profit sharing plan. For three years thereafter he shall pay the plaintiff $708 per week plus 40% of any net bonus or other supplemental payments, excluding his profit sharing plan. Thereafter, until the death of the plaintiff or the defendant or until the remarriage of the plaintiff, the defendant shall pay to her as periodic alimony $590 per week plus one-third of the net of any bonus or any supplemental payments he shall receive, excluding his profit sharing plan. Mr. Chestone shall provide copies of his W-2 form for each year by February 1 of the following year.
6. The defendant shall name the plaintiff as the primary irrevocable beneficiary on term life insurance in the face amount of $250,000 for as long as he shall be obligated to pay her periodic alimony. Annually he shall provide to her written documentation that the policy remains in effect, and that she remains the primary irrevocable beneficiary thereof.
7. The defendant shall cooperate with the plaintiff in making available to her health insurance benefits under COBRA. Until the sale of the former family home the defendant shall be responsible CT Page 3993 for the cost of such insurance. Thereafter, the plaintiff shall be responsible therefor, and after the expiration of the maximum COBRA period, she shall be responsible for providing health insurance for herself.
8. Each party shall be responsible for the payment of his and her own counsel fees.
9. The parties shall divide their personal property, including the furniture and furnishings in the former family home, by mutual agreement. The parties are referred to the Family Services Office of the Superior Court for negotiation of any differences concerning that division, in accordance with Valentiv. Valenti, 180 Conn. 528, 533 (1980). The court retains jurisdiction to resolve any disputes not resolved between the parties themselves or with the assistance of the Family Services Office.
10. Each party shall pay the liabilities shown on their respective financial affidavits signed and sworn to at the time of trial. Each party shall save the other harmless and indemnify the other party from liability on any of the liabilities shown on their respective affidavits. Likewise, the defendant shall save the plaintiff harmless from any liability on the parties' 1995 income taxes, as previously agreed to between the parties.
11. All right, title and interest in a certain 1985 Corvette shown on both parties' financial affidavits shall be in the defendant, and the plaintiff shall execute any documents necessary to transfer to him any share she may presently have in that vehicle. Until the sale of the former family home, the defendant shall continue making the payments of the lease of the 1994 Honda presently being used by the plaintiff. Thereafter the plaintiff shall be responsible for those lease payments or any other expenditures necessary to provide herself with a motor vehicle.
12. The defendant shall have the sole ownership interest in the 1988 boat shown on his financial affidavit, and he shall be solely responsible for the loan on that boat, saving the plaintiff harmless and indemnifying her from any liability on that loan.
/s/ Shortall ___________________, J. CT Page 3994 SHORTALL