[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an action for the dissolution of a marriage. The parties married on June 23, 1979 at Westport, Connecticut. Both parties have resided continuously in this state for at least twelve months next preceding the date of filing the complaint; therefore, the court has jurisdiction. There are two minor children issue of this marriage: Lindsey Shepherd, born September 24, 1990, and Stephanie Shepherd, born August 21, 1994. The marriage has broken down irretrievably, and a decree of dissolution will enter on that ground.
At trial, the parties entered into an oral stipulation concerning custody and visitation. The stipulation was that the parties would have joint legal custody of the minor children, whose primary residence shall be with the defendant. The plaintiff's reasonable, flexible and liberal rights of visitation include but are not limited to alternate weekends, time during the school year and summer vacation and major holidays in alternate years.
The court, having heard the evidence, finds that the stipulation is in the best interests of the children and shall center an order accordingly.
The plaintiff husband is 46 years old. He finished college in 1973 with degrees in journalism and advertising. His work career has been in the fields of advertising, marketing, sales and publishing, with different employers in New York City. Between 1976 and 1980, the husband was employed in an advertising agency. There followed a brief stint at the New York office of The LosAngeles Times between 1983 and 1984. His salary at that time was in the low to mid $40,000's.
The husband then took employment with Gentlemen's Quarterly[GQ] magazine in 1984. He started as an advertising director and later became a manager. His career seemingly blossomed at GQ, and his income in the last full year of his employment there, 1990, was $137,000. Circumstances at GQ then turned sour for him, and in December, 1990, the husband quit rather than, as he perceived, be fired. He did, however, negotiate a severance agreement of approximately six months salary. CT Page 11375
A period of unemployment of about fifteen months then followed. Most, if not all, of the husband's 1991 reported income of $61,800 the court attributes to the GQ severance. In the husband's words, 1991 was a year of an advertising recession, and he could find no employment.
The husband finally secured a job with Travel HolidayMagazine in March, 1992. He began as a sales director at an annual salary of $80,000 (prorated in 1992) plus commissions. He received a promotion to the position of advertising director in 1994 at an annual salary of $105,000 plus commissions. The husband's reported compensation at Travel Holiday is as follows:
1992 — $68,800
1993 — $148,900
1994 — $119,700
1995 — 160,470
In December, 1995, Travel Holiday was sold and the new buyer began to "clean house." The husband again received an ample severance package consisting of the following net monies fromTravel Holiday, all in 1996: a "stay on" bonus of $35,732 as a condition of his remaining through March, 1996; severance pay of $13,249; unused vacation pay of $4,430; and regular pay of $2,809.
The husband landed on his feet almost immediately following this severance. In April, 1996, he became the travel ad director for Modern Bride magazine. This position commanded a salary of $115,000 plus commissions. As a result, in 1996 the husband earned approximately $205,340, of which $115,964 was from theTravel Holiday employment and severance package previously mentioned and $89,377 from Modern Bride, prorated for that year.
In 1997, the husband was courted by his former employer,Travel Holiday. As a result, he left Modern Bride on July 15, 1997. Before he left Modern Bride, in addition to his usual salary, he received a commission payment of $18,970 gross, $10,700 net. On July 22, 1997, the husband rejoined TravelHoliday. He indicated that the underlying motivation to return was his relationship to the new publisher and his own job function as an associate publisher. His salary at Travel Holiday
CT Page 11376 was $140,000 gross annually and the potential for a $40,000 bonus.
The husband's employment at Travel Holiday lasted only seven weeks. The owner took the publisher off the magazine, and the new publisher preferred his own associate. Hence, the husband was terminated on September 12, 1997. There was no evidence that the termination was anything other than involuntary. Travel Holiday
offered a severance package of $25,000 discretionary pay plus $1,120 for earned unused vacation pay for a total of $26,120. The husband is poised to accept this offer.
In the limited time between the husband's termination and the commencement of this trial on September 30, 1997, he has made what the court considers to be "average" efforts to secure new employment. The husband's efforts have produced only one job offer at $75,000, which he rejected. Accordingly, based upon the evidence at trial, the husband was last earning, at TravelHoliday, $2,692 gross weekly. His net weekly salary was $1,684, after deducting for taxes and other allowable deductions.
The court next turns to the circumstances of the defendant wife. The wife is 43 years old. She is a high school graduate. Both before and during the marriage, she supplemented her education with business related courses so as to become a more marketable employee. This was done with the assent and approval of her husband.
The wife's employment history has been substantially less complex, but also less lucrative, than her husband's. At the outset, it is worth noting that the wife has been fully employed throughout the marriage, with the exception of two maternity leaves for the birth of her two children. Also, all of her take home pay has been contributed to the common family good.
The wife had employment with the James River Corporation in Norwalk beginning in 1987. This employment continued through to the time of the birth of the parties' first child, Lindsey, in September, 1990.
It had been contemplated and agreed by the parties that the wife would quit her employment and devote herself to keeping the home and caring for Lindsey upon her birth. However, the husband's severance from GQ magazine in December, 1990, and what developed into his extended unemployment, changed the parties' CT Page 11377 plan. The wife was then compelled to return to James River in 1991.
In 1992, the wife secured her present employment with Air Age, Inc., in Ridgefield, Connecticut. In 1994, when the parties had their second child, Stephanie, the husband was again employed. However, given the asset depletion which had occurred during the husband's earlier unemployment and residual concerns over his job safety, the wife stayed on at Air Age.
The wife continues in her employment at Air Age through the present day. She holds the position of controller, a job usually reserved for a certified public accountant. She essentially directs the accounting department and is responsible for, among other things, budgeting and acting as the company's liaison with its banks.
The court is persuaded that, at least in terms of job function and pay, the wife is nearing or has reached the maximum her skills and motherly duties will allow. By the latter, the court refers to the fact that, as the primary custodial parent, there are simply not enough hours in the day to expand her employment or to advance.
Based upon her financial affidavit, the wife is now earning $1,227 gross weekly, including bonuses. Her net weekly salary is $926.00, after deducting taxes and other allowable deductions. Parenthetically, the court disallows as deductions 401k contributions, which are voluntary, and child care costs, which should be shown as an expense.
The court next considers the cause(s) of the breakdown of this marriage. Both parties testified as to their perceptions of these causes. At the risk of summarizing these perceptions perhaps too succinctly, the court nevertheless tries.
The husband claimed that the wife failed to recognize the long hours required by his profession; that she considered him "just a paycheck"; and that his wife did not genuinely try to reconcile, as the husband claims he did.
The wife claimed that the husband should have made a more concerted effort to become "involved" in the marriage; that they had "intimacy problems"; and that the husband never gave the wife due recognition or support for an often grueling schedule of both CT Page 11378 holding down a full time job and being the primary care giver of the two young children.
The court believes that there is probably merit to both parties' contentions. The court notes, too, that this marriage has been punctuated by troubles for many years. The husband left the wife for approximately one year in 1982-1983, to "find himself." They then reconciled and resumed relations. Also, both parties have engaged in extramarital affairs. The husband had engaged in six such affairs until he left the family home in December, 1995; the wife had engaged in one which ran intermittently between 1993 and 1995. The court believes that these affairs all played some part in the breakdown of the marriage.
In sum, on this point of fault, both parties share responsibility for the breakdown of their marriage. The court, though, finds that the heavier responsibility rests with the husband. Based on the evidence heretofore stated, the court infers a lack of commitment by the husband to the marital relationship.
Before entering its orders, the court addresses three issues given some prominence by the parties. This is not to say that these are the only three issues considered by the court, or that they are considered in isolation from themselves and others, or from relevant statutory criteria for making awards; they are not. However, these issues are significant enough to warrant some explanation and, where needed, additional findings. These issues are:
1.) whether an "earnings capacity" analysis is an appropriate measurement for determining any obligation of the husband for, inter alia, alimony and support;
2.) an appropriate assignment or division of the marital home; and,
3.) consideration of the wife's claim of asset "dissipation" by the husband.
The court addresses these issues in turn.
1.) Earnings Capacity Analysis
CT Page 11379
 "In marital dissolution proceedings, under appropriate circumstances the trial court may base financial awards on the earning capacity rather than the actual earned income of the parties; Lucy v. Lucy, 183 Conn. 230, 234, 439 A.2d 302 (1981); Miller v. Miller, 181 Conn. 610, 611-612, 436 A.2d 279 (1980); when, as here, there is specific evidence of the [party's] previous earnings. Compare Schmidt v. Schmidt, 180 Conn. 184, 190, 429 A.2d 470 (1980)." Venuti v. Venuti, 185 Conn. 156, 161 (1981).
See also Johnson v. Johnson, 185 Conn. 573, 576 (1981); Miller v.Miller, 181 Conn. 610, 611-612 (1980); McKay v. McKay,174 Conn. 1, 2 (1977).
 "It is especially appropriate for the trial court to base its award on earning capacity where . . . there is evidence before the court that the person to be charged has wilfully depleted his or her earnings with a view toward denying or limiting the amount of alimony to be paid to a former spouse. See Whitney v. Whitney, 171 Conn. 23, 28, 368 A.2d 96 (1976); Tobey v. Tobey, 165 Conn. 742, 749, 345 A.2d 21 (1974); Yates v. Yates, 155 Conn. 544, 548-49, 235 A.2d 656 (1967)." Schmidt v. Schmidt, 180 Conn. 184, 189-90 (1980).
Also, "[i]t is particularly appropriate to base a financial award on earning capacity where there is evidence that the payor has voluntarily quit or avoided obtaining employment in his field. (Citations omitted.)" Hart v. Hart, 19 Conn. App. 91, 95
(1989).
This court does not believe that this is an appropriate case for application of an earning capacity analysis for the following reasons. As noted previously, the husband was employed by ModernBride magazine from April 1, 1996 to July 15, 1997. He then left after he was solicited to return to Travel Holiday magazine. The husband's motivation to return to Travel Holiday appears to have been genuine. He was being offered a higher salary, $140,000, a bonus, $40,000, and the opportunity to become, for the first time, an associate publisher. All in all, the return to TravelHoliday appeared to be a career advancement. That the husband would be terminated approximately seven weeks later, September CT Page 11380 12, 1997, cannot be expected to have been known by him. The court will not simply that degree of hindsight.
Also, there can be no claim that the husband was anything other than involuntarily terminated from Travel Holiday; his firing was not engineered. Finally, the husband appears to have been making reasonable efforts to find employment since his firing and the time of trial. This court cannot say, at least at this point in the husband's job search, that it was inappropriate for him to reject his one job offer at $75,000 annually.
(a) Severance Pay
 Before leaving this topic, the court addresses the matter of the Travel Holiday severance pay, $25,000, which the husband testified he would accept. This court has had previous occasions to consider the nature of severance monies as they relate to alimony and support obligations. See Burke v. Burke, FA92 128075 S, J.D. Stamford/Norwalk (August 2, 1996) (Kavanewsky, J.); Ponger v. Ponger, FA94 139858 S, J.D. of Stamford/Norwalk (September 17, 1996) (Kavanewsky, J.) and authorities cited therein. For the reasons stated in these decisions, the court agrees with the wife that the husband's severance pay, as it relates to his last salaried income at Travel Holiday, $140,000 per year[1] is an appropriate barometer together with the relevant statutory criteria for measuring and ordering alimony and support obligations. The severance pay, $25,000 gross, represents approximately nine (9) weeks of the husband's last earnings. This is calculated by dividing gross earnings by gross severance pay and then dividing 52 weeks by that factor.
(b) Periodic Alimony
 Therefore, the court will order a periodic alimony award at a designated sum for nine weeks followed by a nominal order. The nominal order is based upon the husband's unemployment. It would be a basis for considering a modification should the husband regain employment. CT Page 11381
(c) Child Support
 The court also enters an order for the husband to pay to the defendant a designated sum for the support of the parties' two children. Child support payments are calculated to begin on January 5, 1998. This calculation is accomplished as follows.
 The parties agreed that any child support ordered would be retroactive to April 28, 1997, and that the husband would be given a credit for any payments made after that date. The court finds that the husband is entitled to a $12,500 credit. While the husband has paid a total of $13,085, the court disallows $585 designated as a payment for the wife's car insurance. A payment subsidizing car insurance does not appear to be in the nature of a support payment. Moreover, the custodial parent has "the right and privilege to determine how and in what manner child maintenance funds should be spent. 27 CJS, Divorce § 321(2), p. 639." Rempt v. Rempt, [5 Conn. App. 85], 89 [(1985)]."
 The court's order for weekly support used as a divider against the $12,500 credit results in 36 weeks against which the husband has paid/prepaid. Thirty-six weeks from April 28, 1997 is Monday, December 29, 1997. Therefore, child support payments are to begin the following week, January 5, 1998.
 The court does not order that the support payments are modified to a nominal order after nine (9) weeks, as is the order for periodic alimony. Rather, the support payments shall continue even though the husband may remain unemployed.
 "In determining whether a child is in need of maintenance and, if in need, the respective abilities of the parents to provide such maintenance and the amount thereof, the court shall consider the age, health, station, occupation, earning capacity, amount and sources of income, estate, vocational skills and employability of each of the parents. CT Page 11382 . . ." CGS § 46b-84 (c).
 Trial courts are required to consider the statutory criteria in passing upon prayers for awards such as child support in domestic relations matters. Schmidt v. Schmidt, 180 Conn. 184, 189 (1980).
 Also, an award of alimony and child support may be based upon, in part, consideration of the assets which the party in a dissolution proceeding retains. Beede v. Beede, 186 Conn. 191, 196 (1982); Graham v. Graham, 25 Conn. App. 41, 43-44 (1991) cert. denied., 220 Conn. 903.
 In the instant case, the husband is left with not insubstantial liquid assets as a result of the court's orders. He will retain 50% of the parties' Paine Webber account, worth approximately $19,500, bank and checking accounts of nearly $20,000, stock of $3,400, the New York State tax refund of $2,675, an annuity worth $14,000 and a 401k of about $52,000[2]. It would be unjust and inequitable to require the wife to bear the entire expense of supporting the children when the husband, though unemployed, has ready assets at his disposal. While modification of periodic alimony to a nominal order to reflect the husband's unemployment is one matter, it does not necessary follow, under our statutes, that child support orders must follow in unison.
 Finally on this matter, the court considers the possible application of the Connecticut Child Support Guidelines. Certainly during the initial nine weeks of payment of child support (when the husband's severance monies are paid out), the parties' combined net weekly income exceeds the guidelines maximum, and the guidelines do not apply. Guidelines § 46b-215-2 (a).
One can posit, however, that at the end thereof when the severance is exhausted, the parties' combined net weekly income falls within the scope of the Guidelines. The Court's response is twofold. First, the Guidelines' enabling statute, C.G.S. §46b-215, "does not require the trial courts to apply the CT Page 11383 Guidelines to all determinations of child support but creates only a rebuttable presumption as to the amount of child support. It requires only that the trial court consider the Guidelines."Battersby v. Battersby, 218 Conn. 467, 470 (1991); also, Draperv. Draper, 40 Conn. App. 570, 573 (1996).
Second, even were this a Guidelines case, this is an appropriate case to deviate from the Guidelines amount for child support. Based upon the wife's net weekly income of $925.00 and the husband's unemployment, the basic child support obligation is $310.00 per week. Guidelines, § 46b-215a-2 (d). The application of that Guidelines amount would be inequitable and inappropriate in this case.
Here, as mentioned previously, the husband has financial resources in the nature of substantial assets which could be used by him for the benefit of the children. Guidelines §46b-215a-3 (b)(1)(A). Also, in the instant case there are "special circumstances not otherwise addressed" in the guideline regulations. Specifically, the wife has $364.00 per week in unreimbursed day care costs incurred for the children. This cost is reasonable, the payment of the costs fails to leave sufficient funds for the children's other needs, and day care is necessary for the wife to maintain her employment. Guidelines, §46b-215a-3 (b)(6)(B).
Under any methodology, it is appropriate for the husband to bear a part of the cost of supporting his children even if he is unemployed. Certainly, it remains within the court's discretion to modify or suspend the husband's support obligation should his unemployment be unduly prolonged.
2. The Marital Home
The court next sets forth the following additional facts which relate to an appropriate assignment or division of the marital home. In 1978, before their marriage, the parties purchased a home in Stratford, Connecticut. The purchase price was $54,250. The parties paid $5,000 — $5,500 as a down payment, and the balance of the price was financed with a mortgage. The sources of the down payment were a gift from the wife's father and the sale of a car owned by the wife.
In 1983, the parties bought the present marital home at 489 Ridgefield Road in Wilton, Connecticut. The purchase price was CT Page 11384 $145,000. They put $45,000 down against the price. The parties dispute the source of the down payment, but the court finds that it was a combination of the net proceeds of the sale of their first home and an inheritance of the husband. The balance of the purchase price was financed with a $100,000 mortgage. The parties have made substantial improvements to the property. Its present value is approximately $380,000[3], with a mortgage of about $90,000.
The parties disagree on the appropriate disposition of the marital home. The husband asks that the home be promptly listed for sale, and after payment of closing costs and the mortgage, the net proceeds divided evenly. The husband moved out of the home in late December, 1995, and now lives in an apartment in Norwalk. The court infers that it is the husband's intention to use his share of the proceeds to purchase his own residence so as to acquire some residential stability, especially for purposes of visitation with his children.
The wife requests that the marital home be assigned to her outright, as a lump sum property settlement. She claims that the home, which is in the north end of Wilton, is very convenient to her work place in Ridgefield. From work, it is only a short drive to pick-up either of the children at school or in day care. Also, the mortgage payments, property taxes and insurance come to slightly less than $1,600 per month, so that the home is affordable to her.
The court has considered all the facts found in this memorandum of decision in light of the mandate of C.G.S. §46b-81 and the judicial gloss put on that statute. See Smith v.Smith, 185 Conn. 491, 493 (1981).
3. Asset Dissipation
Finally, the court briefly addresses the wife's claim that, in considering any asset division, it should take into account the husband's claimed asset dissipation pendente lite. See, defendant's disposable asset analysis, September 30, 1997. It should first be noted that the wife had filed two motions for restraining orders, pendente lite (no.'s 108 and 114). Neither of these was prosecuted to an order. One of the motions, (no. 108) related specifically to a bonus check which is also listed on the wife's disposable assets analysis. The court is left to wonder why the wife did not take appropriate measures to obtain a court CT Page 11385 order if she felt it was necessary. Compare Turgeon v. Turgeon,190 Conn. 269, 284 (1983). Notwithstanding the foregoing, the court considers the legal issue and the evidence presented.
"The party who has control over marital assets and is charged with their dissipation has the burden for accounting for those assets. Vaiuso v. Vaiuso, 2 Conn. App. 141, 146, 477 A.2d 678, cert. denied, 194 Conn. 807, 482 A.2d 712 (1984)." Manaker v.Manaker, 11 Conn. App. 653, 659 (1987).
Here, the husband received substantial monies, previously mentioned, from his employment and from severance packages in 1996 and 1997. Also, there can be little dispute that the husband had control over these monies during the same time. The court is persuaded that the husband has made an accounting for the substantial part of these monies. The accounting is adequate given the length of time over which expenses were incurred, the wide variety of expenses, and the availability of records.
The wife's assertion that the "husband may have dissipated [monies] . . . for his own sole benefit and high living" (see wife's disposable assets analysis, p. 3) is a conclusory statement not sufficiently supported by the record. Compare,Burns v. Burns, 41 Conn. App. 716, 723 (1996), appeal denied239 Conn. 906 (court finding that during the last years of the marriage the husband borrowed money for living expenses while spending money on gifts and travel expenses for his women friends).
The trial court finally considers the matter of an award of attorney fees, inasmuch as such an award has been requested by the wife. "The trial court exercises broad discretion in determining whether to allow counsel fees, and, if so, in what amount. In exercising that discretion, the court must consider the statutory criteria set out in General Statutes § 46b-82
and the respective financial abilities of the parties. Elliott v.Elliott, 14 Conn. App. 541, 547, 541 A.2d 905 (1988); see alsoVoloshin v. Voloshin, 12 Conn. App. 626, 631-32, 533 A.2d 573
(1987)." Lawler v. Lawler, 16 Conn. App. 193, 205 (1988), cert. granted in part, 209 Conn. 821, appeal dismissed 212 Conn. 117.
It is true that, as a result of this court's awards, the wife will retain her own bank accounts totalling approximately $2,400, and she will receive another $19,500 in liquid funds as the result of dividing the parties' joint Paine Webber account. CT Page 11386 However, ". . . the availability of `sufficient cash' to pay one's attorney's fees is not an absolute litmus test for making an award pursuant to General Statutes § 46b-62." Fitzgeraldv. Fitzgerald, 190 Conn. 26, 33 (1983); Howatt v. Howatt,1 Conn. App. 400, 408 (1984).
In this case, the court wishes to preserve as much as possible the liquid assets awarded to the wife. This is, in part, because of the husband's present unemployment and the uncertainty of when he will be able to assist financially his wife. Further, the husband has the greater potential to accumulate liquid assets once he is employed. Also, the husband has paid, from marital funds, a disproportionately greater sum to his own attorney than has the wife. The court has considered all of the criteria set forth in § 46b-62.
The court is persuaded that, without an award to the wife of counsel fees, its other financial awards would be undermined.Eslami v. Eslami, 218 Conn. 801, 819-20 (1991); DeVino v. DeVino,190 Conn. 36, 38-39 (1983); Petro v. Petro, 31 Conn. App. 582,583 (1993), cert. denied 227 Conn. 907; Palazzo v. Palazzo,9 Conn. App. 486 (1987).
The court, having considered all the evidence in light of all relevant statutory criteria, enters the following orders:
1. The marriage of the parties is dissolved on the grounds of an irretrievable breakdown.
2. The parties shall have joint legal custody of the minor children issue of the marriage, Lindsey Shepherd and Stephanie Shepherd. The primary residence of the children shall be with the defendant. The plaintiff shall have reasonable, flexible and liberal rights of visitation to include, but not be limited to, alternate weekends, time during the school year and summer vacation, and major holidays in alternate years.
3. The defendant shall provide to or for the benefit of the minor children such medical and dental insurance as may be available through her employment, and the plaintiff shall reimburse the defendant for one-half of the cost thereof. In the event the defendant does not have such insurance available to her, the plaintiff shall provide to or for the benefit of the minor children like insurance as may be available through his employment, and the defendant shall reimburse the CT Page 11387 plaintiff for one-half of the cost thereof. The parties shall each be responsible for one-half of the cost of any uncovered or unreimbursed medical, dental, psychological or therapy expenses as may be reasonably necessary to or for the benefit of the minor children. Any unreimbursed medical, dental, psychological or therapy expenses incurred on behalf of the minor children shall be shared equally by the parties.
4. The plaintiff shall pay to the defendant as periodic alimony the sum of Four Hundred ($400.00) Dollars per week for nine (9) weeks beginning December 1, 1997 and concluding January 26, 1998.
 At the conclusion thereof, the plaintiff shall pay to the defendant, as periodic alimony, the sum of One ($1.00) Dollar per year beginning February 2, 1998.
 The periodic alimony award shall terminate upon the happening of any of the following events, whichever first occurs: (a) the defendant's death; (b) the defendant's remarriage; (c) in the discretion of the court pursuant to CGS § 46b-86 (b), the defendant's cohabitation; or, (d) the youngest child of the marriage completing the twelfth grade or attaining the age of 19, provided that such child is a full time high school student and resides with the defendant, and if not, then until the youngest child of the marriage attains the age of 18.
 The plaintiff shall notify the defendant monthly and in writing of any employment offers and the essential terms thereof. The plaintiff shall also notify the defendant within three (3) business days and in writing of any employment offer and the essential terms thereof, which he has accepted.
5. The plaintiff shall pay to the defendant as and for child support the sum of Three Hundred Fifty ($350.00) Dollars per week beginning January 5, 1998, until the youngest child of the marriage completes the twelfth grade or attains the age of 19, provided that such child is a full time high school student and resides with the defendant, and if not, then until the youngest child of the marriage attains the age of 18.
6. For tax purposes the plaintiff may claim Lindsey and the defendant may claim Stephanie as dependents. CT Page 11388
7. The court finds as an arrearage for reimbursement of health insurance premiums the sum of $634.97 thru to and including November 20, 1997, with said arrearage continuing to accrue at the rate of $90.71 beginning November 21, 1997 and every two weeks thereafter.
 The plaintiff may, at his election, continue to receive health insurance coverage for himself as permitted by law through the defendant's employment provided that the plaintiff do whatever is necessary to make such election and that the plaintiff pay for the cost of same.
8. For as long as the plaintiff shall have an alimony or support obligation, he shall cause to have in force and effect a life insurance policy on his own life in the sum of at least $200,000, naming the defendant as the beneficiary thereof as and for trustee for the children. The plaintiff shall provide to the defendant satisfactory evidence thereof within thirty (30) days and at such other times as may be reasonably requested by the defendant.
9. a. The defendant shall have exclusive use and possession of the marital home at 489 Ridgefield Road, Wilton, Connecticut, until the sale of the home as hereinafter set forth.
 b. During said time, the defendant shall be responsible for, and shall indemnify the plaintiff against, payment of the mortgage, property taxes and insurance and shall be allowed in full any tax deductions therefore.
 c. During said time, the defendant shall also be responsible for any usual and ordinary maintenance and repair expense; the plaintiff and defendant shall be equally responsible for any capital or other expense in excess of $1,000.
 d. The home shall be listed for sale on May 15, 1999 or sooner at the election of the defendant.
 e. If the parties are unable to agree on a listing price, the price shall be set by averaging the suggested listing price of each party's appraiser.
 f. Any offer within ten (10%) percent of the listing price shall be accepted. CT Page 11389
 g. Upon the sale and after payment of the mortgage, broker's fee, attorney's fee and any other usual and customary closing expenses, the net proceeds shall be divided thirty-five (35%) percent to the plaintiff and sixty-five (65%) percent to the defendant.
 h. Each party shall be responsible for any taxable gain in said proportion.
 i. The court shall continue to reserve jurisdiction over matters relating to the listing and sale of the property.
 j. Neither party shall cause or allow the property to be further encumbered without the consent of the other party.
10. The defendant is awarded all of the furniture and furnishings in the marital home, with the exception of the grandfather clock and the plaintiff's personal papers and effects, which are awarded to the plaintiff.
11. The plaintiff is awarded the 1994 Nissan Altima automobile and shall be responsible for any outstanding loan and shall indemnify and hold harmless the defendant from any claim or demand thereon. The defendant is awarded the 1993 Jeep Grand Cherokee automobile.
12. The parties shall divide equally the Paine Webber joint account, including any interest in the related class action.
13. The plaintiff is awarded the asset in the nature of a loan obligation of June and Jack Shepard, as was particularly set forth on defendant's financial affidavit.
14. The plaintiff is awarded the New York State tax refund in the approximate amount of $2,675.
15. The plaintiff is ordered to pay the defendant Ten Thousand ($10,000) Dollars as a contribution towards her counsel fees.
16. Except to the extent more specifically set forth herein, each order of the court is to be effectuated within thirty (30) days of the date of this decision. CT Page 11390
17. Except to the extent more specifically set forth herein, each party shall retain all assets as shown on their respective financial affidavits free and clear of any claim or demand by the other, and each party shall be responsible for all liabilities as shown on their financial affidavits and shall indemnify and hold harmless the other party from liability therefore.
18. Counsel for the plaintiff shall prepare the judgment file.
Judgment shall enter in accordance with the foregoing orders.
KAVANEWSKY, J.